UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

| | | |
|---|---|---|
| PIPEFITTERS LOCAL NO. 636 DEFINED BENEFIT PLAN, Individually and on Behalf of Itself and All Others Similarly Situated, | ) ) ) | CLASS ACTION COMPLAINT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TEKELEC, FRANCO PLASTINA, WILLIAM EVERETT, and GREGORY RUSH, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Tekelec ("Tekelec" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of Tekelec between February 11, 2010 and August 5, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §§1331 and 1337.

4.      Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

5.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## PARTIES

6.  Plaintiff Pipefitters Local No. 636 Defined Benefit Plan, as set forth in the certification attached hereto and incorporated herein by reference, purchased the common stock of Tekelec during the Class Period and has been damaged thereby.

7.  Defendant Tekelec is engaged in the design, development, manufacture, marketing, sale and support of telecommunications products and services. Defendant Tekelec is a California corporation that maintains its headquarters in Morrisville, North Carolina.

8.  Defendant Franco Plastina ("Plastina") served as Tekelec's President, Chief Executive Officer and a Director of the Company during the Class Period.

9.  Defendant William Everett ("Everett") served as Tekelec's Executive Vice President and Chief Financial Officer ("CFO") until his retirement from the Company on March 31, 2010, at which point he served as a "consultant" to the Company for the balance of the Class Period.

10. Defendant Gregory Rush ("Rush") served as Tekelec's Chief Accounting Officer, Vice President and Corporate Controller until April 27, 2010 when the Company announced that Defendant Rush had been appointed as Tekelec's Senior Vice President and CFO of Tekelec replacing Defendant Everett.

11. Defendants Plastina, Everett and Rush are collectively referred to herein as the "Individual Defendants."

12. During the Class Period, the Individual Defendants, as senior officers and/or directors of Tekelec, were privy to confidential and proprietary information concerning Tekelec, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Tekelec, as discussed in detail below. Because of their positions with Tekelec, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and

- 2 -

future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were concealed from the investing public.

13.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Tekelec's business.

14.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with

- 3 -

respect to Tekelec's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Tekelec common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of Tekelec common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Tekelec's business, operations and management and the intrinsic value of Tekelec securities; (ii) enabled Tekelec insiders to sell their personally held Tekelec common stock to unsuspecting investors at artificially inflated prices; and (iii) caused Plaintiff and other members of the Class to purchase Tekelec common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Tekelec between February 11, 2010 and August 5, 2010, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the Officers and Directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tekelec common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

- 4 -

only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tekelec or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

20. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

21. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Tekelec;

(c) whether the price of Tekelec common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

22. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

23.     Defendant Tekelec is a global provider of communication network software and systems that enable users to deliver an array of communications services including voice, text messaging, and mobile data services. The Company's software is designed to enable its customers, predominantly mobile (or wireless) and fixed (or wireline) service providers, to optimize network efficiency and transition traditional networks to Internet Protocol ("IP") - based mobile networks. There are more than 1,800 Tekelec systems and software applications deployed in networks located in 107 countries worldwide.

24.     Tekelec's Form 10-K for the year ended December 31, 2009 (the "2009 Form 10-K") explains:

> Wireless and wireline networks make use of a signaling network that is logically and often physically separated from the media or transport network. The signaling network improves overall network performance by reducing call setup times, increasing the efficiency of the network, providing for interoperability between two independently owned networks, and providing access to enhanced services. Historically, the technology underpinning wireless and wireline networks has been the globally accepted signaling protocol known as Signaling System #7, or SS7.

*     *     *

> *Expanding Globally.* We sell our products internationally through our direct sales force, sales agents, partnerships, and distributor relationships. ***We also sell directly from our wholly owned subsidiaries in Argentina, Australia, Belgium, Brazil, Canada, Colombia, the Czech Republic, France, Germany, India, Italy, Malaysia, Mexico, the Netherlands, Singapore, South Africa, Spain, Taiwan and the United Kingdom, and from our sales offices in China, Dubai, and the Russian Federation. Total international revenues for 2009, 2008, and 2007 were $285.8 million, $296.8 million, and $263.7 million, respectively, representing 61%, 64%, and 61%, respectively, of our total revenues.***

*     *     *

- 6 -

India is in the process of mandating number portability and we were successful in winning eight out of the ten service providers we were invited to bid on. The Indian government has delayed the mandatory implementation date to early to mid 2010 and, accordingly, our 2009 number portability revenues do not include any significant revenues from these deals. ***We currently expect that these orders will convert to revenue during 2010 and 2011. Because number portability opportunities are increasingly becoming integrated with our larger Eagle signaling opportunities, we anticipate that we will combine the reporting of our Eagle and NP product line revenues in 2010***. [Emphasis added.]

25. The Class Period begins on February 11, 2010. On that date, Tekelec issued a press release announcing its earnings for the three months and year ended December 31, 2009. The press release stated, in pertinent part as follows:

Tekelec Announces Strong Q4 and Full Year 2009 Operating Results

\*        \*        \*

**2009 Fourth Quarter Results from Continuing Operations**

Revenue from continuing operations for the fourth quarter of 2009 was $123.5 million, up 3% compared to $119.9 million for the fourth quarter of 2008. ***The Company had orders of $162.4 million for the quarter, up 1% from the fourth quarter of 2008, and the second consecutive quarter of year-over-year growth. As of December 31, 2009, backlog was $373.6 million compared to $336.7 million as of September 30, 2009*** and $412.1 million as of December 31, 2008.

Defendant Plastina commented on the results, stating in pertinent part as follows:

We are very pleased with our operating results, and in particular, with the strength of our orders for the fourth quarter. ***Our orders for the quarter were up 1% compared to 2008. For the last six months of the year, orders were up 4% over the same period in 2008 and we generated a book-to-bill ratio of approximately 1.10 to 1 during the second half of 2009***. Our strong financial performance during the fourth quarter and full year of 2009, including year-over-year revenue growth for the quarter and year, along with record earnings per share of $1.04 for the full year, reflect our disciplined approach to bringing value to our customers and shareholders despite the difficult competitive and financial climate.

\*        \*        \*

**2010 Full Year Guidance**

While there remains uncertainty in current economic conditions, ***based on improved visibility compared to last year***, we are providing full year guidance for 2010. We believe that full year revenues will range between $470 and $480 million and gross

margins will be in the mid to high sixty percent range. Finally, we believe that our non-GAAP EPS range will be between $1.10 and $1.15 per diluted share and we expect the range for GAAP EPS will be between $0.90 and $0.95 cents per diluted share. In addition, we expect our book to bill ratio to be approximately one to one for the year. **[Emphasis in bold and italics added.]**

26.    That same day, Defendants held a conference call with securities analysts for investors, which included, in pertinent part, the following prepared remarks by the Individual Defendants:

Defendant Plastina:

We booked four new EAGLE XG orders during the fourth quarter including two expansion orders from existing EAGLE XG customers.  Both expansions involved a new SIP signaling router application providing BICC to SIP interworking.  BICC is one of the many protocols used by most of the world mobile service providers. In one of these wins, we simplified session management between the mobile network and the long distance network.  Our application cost effectively completes the session without disrupting the billing.  We won this deal against an expensive competing solution that involved the costly proposition of upgrading a mobile switching server, adding multiple media gateways and modifying the back office systems for billing. Including the four EAGLE XG wins during the fourth quarter, we have now booked a total of 13 EAGLE XG orders with 11 customers.  Nine of these customers are tier one service providers.  We finished the year with over $30 million of EAGLE XG orders in our backlog.

\*       \*       \*

***Our continued success in the market is evidenced by our new customer wins.  We added a total of five new customers during the quarter.  In total, we won 19 new customers last year and have won 59 new customers over the last three years.  We now have products installed in 107 countries around the world.  We are especially pleased with our growth in the emerging markets such as India and Brazil and the innovative insights that we gain from emerging market service providers.  In these markets, creative service providers are in many instances surpassing developed world market players in bringing innovations to market.*** For example it is likely that a mobile device will facilitate a consumers first web surfing or banking experience in these markets.  This scenario stresses the importance of having a global perspective and strong installed base in order to remain at the forefront of innovation. The fact that we do business with most of the world's major service providers, across 107 countries is a distinct competitive advantage for Tekelec.

Defendant Everett:

- 8 -

As shown on slide 17, *we had strong order entry in the fourth quarter generating $162.4 million in new orders which exceeded the high end of our previous guidance. We benefited from higher than anticipated demand*, particularly in North America. Some of these fourth quarter orders generated book shift business in the quarter which also help to succeed our revenue target and increase our quarterly gross margins. *This strong order entry generated a book to bill ratio of 1.3 for the quarter which helped increase our backlog. In the second half of 2009, we generated orders of $257.2 million, up 4% from the second half of 2008. For the full year 2009, orders were $429.8 million, down 5% compared to the full year of 2008. This performance was in an environment where year over year global telecom spending, excluding China, was down approximately 12% based on Credit Suisse's most recent industry CapEx estimates. Further, as we previously indicated, our fourth quarter orders include four EAGLE XG wins. These additional wins provide further market validation for the value provided by Tekelec suite of next generation signaling applications.* [Emphasis added.]

27.    Given its significance, on the conference call securities analysts questioned the

Individual Defendants about the Company's forays into the international markets generally and the

Indian market in particular. The following exchange took place:

Amir Rozwadowski - Barclays Capital - Analyst:

In looking at your guidance for next year, is there a built-in expectation that you see similar patterns or increased capacity purchases or books shipped? I'm just trying to understand how you're sort of looking at it in terms of business mix coming from bookings versus books shipped in 2010.

Defendant Plastina:

The mix we've left largely the same as it was in 2009. *The 2010, 470 to 480 target reflects our current conversations and how our current customers think they're going to spend their CapEx budget. That will obviously be adjusted depending on base demand, but right now there is enough visibility for us to at least give you that annual number. Last year we didn't have that visibility. So I think that's obviously a positive sign versus last year. Right now that 470, 480 literally reflects the conversations that we've had with all our major customers.*

Defendant Everett:

Amir, if you are asking is there a fundamental change in assumption relative to that? I don't think we have a fundamentally different view. It represents a consistent component of our business. Some quarters it's higher than others, it was particularly high in Q4, but we are not assuming, for example, that we have to make some fundamental change in our books shipped business to arrive at our numbers for next year.

<u>Amir Rozwadowski</u> - Barclays Capital - Analyst:

Okay. That's very helpful. Lastly, if I may, Frank. You talk about improving visibility. Certainly, last quarter when we spoke, there was some concerns about particular regions not seeing any signs of recovery just yet. Europe was an area that you had mentioned. I was wondering if you could talk a bit of where we stand today. Is some of the more challenged regions, have they improved as we stand today, or how should we think about things from that perspective?

<u>Defendant Plastina:</u>

***I think the emerging markets remain strong. In particular our position in India and Brazil remains strong***. Western Europe remains weak. That's still an area where there is very little CapEx, anticipatory CapEx spending is probably the best way to put it. It's really day-to-day maintenance. We saw some of our book ship in 2009 to western Europe go down versus 2008. That was more than compensated by the strength in North America. I think it really comes down to not really necessarily a regional play, but where a particular service provider is in their evolution path. What is their smart phone penetration? What kind of services are they doing on their network? How much penetration do they have as they reach a saturation point? That's how we look at it as opposed to any kind of particular regional tendencies. The emerging market players are still growing because they are still adding a lot of subscribers at the very different dynamic than western Europe, for example.

*       *       *

<u>George Notter</u> - Jefferies - Analyst:

Wanted to ask about India. Obviously there's been some delay in the timing of the 3G license awards there. You mentioned all of the success you;re having in terms of LMP customer wins. I guess I'm just wondering if you are see some push outs in the timing there? I know you're involved in the signaling piece as well. What are your thoughts there? Thanks.

<u>Defendant Plastina:</u>

***<u>We are seeing live date push out George, but that doesn't really impact our revenue</u> because the revenue is based on customer acceptances, which is a contractual term. So we still expect to book most of the -- vast majority of the revenues this year and next. So 12 to 24-month time frame is still what we're looking at to book all of the orders that we have in the backlog now for India number portability***.

*       *       *

<u>Larry Harris</u> - CL King - Analyst:

- 10 -

I want to talk more about India. I think the number portability opportunity previously been sized as around $50 million or $75 million perhaps over several years. Do you think that that opportunity, now that you've won eight out of the ten bids, has increased and also I get the sense that there's -- you're probably less concerned about margins in India than perhaps you were previously. Is that a correct assumption?

Defendant Plastina:

That's a correct assumption. I think if you look at our target for the year in 2010, we haven't moved away from historical ranges. We're comfortable with that. Obviously 2010 includes some revenue from India number portability. I think the important way to look at India number portability is it's built up a beach head for us in all of those customers. A few of those customers did not have a separate signaling layer before they had to make this number portability decision. We actually went in there and showed them the business case and having a separate layer and the savings coming from it. They decided to move to our solution for number portability, but at the same time start driving a lot of the core signaling traffic through our equipment as well. They also wanted to make sure that all of this with evolvable to 3G. They are planning ahead in the sense they don't just want to do number portability. They don't just want to handle today's signaling traffic. They wanted to make sure there was a core and a set of products that could evolve to that next generation. Certainly, our portfolio met those needs.

Larry Harris - CL King - Analyst:

Do you think there are opportunities because they are going to be installing this equipment and you've won more carriers, is that larger than what you might of seen three or six months ago?

Defendant Plastina:

I think this is just going to evolve towards a sizeable signaling business much like we have in other countries where we've been there a long time and that's the way to look at it. *We think the India business, now that we've got that very solid starting point, is going to continue to morph and they're going to have extension business and all of the other things our US customers have over time. I think it's probably this year or next that India will clearly be our second largest single country market after the US*.

Defendant Everett:

Larry, without regard to even the advent of 3G, just from a subscriber basis alone, there is roughly 525 million mobile subscribers in India today. That number's projected to go up to over 800 million in the next several years. So just through subscriber growth alone there should be a significant amount of additional signaling traffic.

<u>Defendant Plastina:</u>

Right now, all we're doing is signaling in most of these customers. We do have a couple of customers for monitoring and our other products, but obviously we have the up sell opportunity to go deeper into each one of these accounts that we've won with the rest of our portfolio.

<u>Larry Harris</u>  - CL King – Analyst:

Sounds positive. Thank you.  [Emphasis added.]

28.      In response to the Company's announcement and the Defendants' positive statements, on February 11, 2010, the price of Tekelec stock rose $2.01 per share, or approximately 13.5%, on heavy volume to close at $16.86 per share.

29.      On February 16, 2010, Tekelec issued a press release announcing that Bharat Sanchar Nigam Ltd., the world's seventh largest telecommunications company providing a comprehensive range of telecom services in India, selected the Company to provide mobile number portability and session initiation protocol ("SIP") routing.  The press release also noted that Tekelec had 97 number portability customers – including eight in India – in 33 countries at the end of 2009 and that Tekelec has won eight out of the ten number portability bids in India it has entered.

30.      On February 25, 2010, Tekelec filed the 2009 Form 10-K with the SEC, which included the following representations about the Company's disclosure and internal controls and Defendant Plastina's and Everett's certification thereon:

Based on our management's evaluation (with the participation of our Chief Executive Officer and Chief Financial Officer), as of the end of the period covered by this Annual Report, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) are effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

- 12 -

\*    \*    \*

Our management, including our Chief Executive Officer and our Chief Financial Officer, does not expect that our disclosure controls and procedures or our internal control over financial reporting are or will be capable of preventing or detecting all errors and all fraud. Any control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. The design of a control system must reflect the fact that there are resource constraints and the benefits of controls must be considered relative to their costs. Further, because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within the company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.

\*    \*    \*

I, [Defendant Plastina and Everett], certify that:

1.    I have reviewed this Annual Report on Form 10-K of Tekelec;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

- 13 -

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an Annual Report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

31. The above representations about Tekelec's disclosure controls were repeated in all material respects and Defendant Plastina's and Rush's certifications thereon were included in the Form 10-Q for the quarter ended June 30, 2010 that Tekelec filed with the SEC during the Class Period.

32. On May 6, 2010, Tekelec issued two press releases: (i) an announcement of its agreements to acquire two networking companies, Camiant and Blueslice Networks; and (ii) an announcement of its earnings for the first quarter ended March 31, 2010, which stated, in pertinent part:

- 14 -

Revenue for the first quarter of 2010 was $116.0 million, down 1% compared to $116.7 million for the first quarter of 2009. The Company had orders of $56.7 million for the quarter, down 17% from the first quarter of 2009. ***Orders in the first quarter of 2010 were adversely impacted in part by new regulations in India, which require equipment suppliers receive a security clearance from the Indian government prior to receiving purchase orders from telecommunications carriers. These new regulations resulted in the delay of approximately $10 million of orders. We expect to receive these orders during the second quarter of 2010***. As of March 31, 2010, backlog was $308.4 million compared to $373.6 million as of December 31, 2009 and $359.3 million as of March 31, 2009.

*      *      *

Full Year 2010 Guidance

*      *      *

For the full year, we expect combined revenues will range between $465 million and $480 million. This estimate reflects the elimination of up to an estimated $10 million of deferred revenues from the acquired companies as a result of purchase accounting. Gross margins are estimated to be in the mid to high sixty percent range. We expect non-GAAP EPS, excluding the impact of the above mentioned purchase accounting adjustments and certain one-time acquisition related items, to range between $0.95 and $1.10 per share. Including the estimated $0.08 to $0.12 cents per share impact of these items, we expect our non-GAAP range to be between $0.85 and $1.00 per share. Finally, we expect our book to bill ratio to be approximately 1 to 1.

33.     That same day, Defendants held a conference call with securities analysts for investors, which included, in pertinent part, the following prepared remarks by Individual Defendants:

<u>Defendant Plastina</u>:

Turning to the results for the first quarter, we generated orders of $56.7 million, revenue of $116 million, gross margins of 67%, operating margins of 24%, and diluted EPS of $0.26 per share. ***In addition to typical first quarter seasonality, orders in the first quarter were adversely impacted in part by new regulations in India. These new rules require equipment suppliers to receive a security clearance from the Indian government prior to receiving purchase orders from telecommunications carriers. These new regulations resulted in the delay of approximately $10 million of orders. We expect to receive these orders during the current quarter***. Greg will provide more detail of our results later in the call.

<u>Defendant Rush</u>:

- 15 -

I would like to point out that there are an unusually large number of acceptances, particularly those associated with number portability in India, which could result in significant variability in our revenues between the second and third quarter. Based on our current expectations, we believe our second quarter revenues will be our lowest of the year and lower than Q2 2009. We expect our combined book to bill ratio will be approximately one to one for the year. [Emphasis added.]

34. In response to questions by securities analysts, Defendant Plastina stated, in pertinent part:

<u>Brian Modoff</u> - Deutsche Bank - Analyst:

Okay and then turning to your business, the $6 million in orders, even if you add the $10 million in, was still weak. Is this really more of a softening demand transfer to EAGLE 5? In other words, are we starting to see that product line starting to show it's age a little bit before the EAGLE XG pops up or what is your view on that?

<u>Defendant Plastina:</u>

It is a combination of things. ***It is really a slow [down] in the emerging markets is what we have seen.*** The aggressive build up and extension and expansion plans have just been slowed down. We saw a pretty solid US business, including EAGLE 5. Year over year our booked ship business was up in the quarter. So it seems to be a bit of a regional thing in terms of the EAGLE 5 business. Going forward, the plan is always to start moving all of the expansion capabilities, including SIGTRAN and all the other core processing functionality onto EAGLE XG.

\*         \*         \*

<u>Amir Rozwadowski</u> - Barclays Capital - Analyst:

Thank you very much and good morning, Frank, Greg and Mike. Frank, I just wanted to turn to your guidance a bit here. If we take a look at sort of the organic guidance for the business it seems to have come down a little bit from your prior expectations. I was wondering what the major puts and takes were there? Is it sort of the timing around some of the India related issues you had mentioned or how we should think about that?

<u>Defendant Plastina:</u>

A couple of things. Really the cautiousness in the emerging markets, as I mentioned in the earlier question. ***What we are seeing is, is a more cautious spending tone in terms of the expansion business in some of the bigger emerging markets and that includes India. India, then has the security issues that really delayed things by about 90 days in the first quarter. There is a double whammy in India.***

- 16 -

Overall, we are still seeing some pretty good traction and expect growth in our non - EAGLE 5 business. So this is really an emerging markets EAGLE 5 related flatness. Is the way I would categorize it. The order outlook has come down. The revenue has come down a bit. Obviously, now we've got the opportunity to up sell the new products and we expect some contribution from the new products this year.

\* \* \*

Michael Genovese  - Soleil Securities - Analyst:

Okay. And then, last quarter, you had a lot of wins that you talked about in mobile number portability deals in India. What is the outlook now for that? For actually M&P to actually be implemented and for some -- for orders in that area to come back? What is your current thinking?

Defendant Plastina:

The implementation is going on as we speak. We are ready to actually turn on several of the networks. And as you heard, in Greg's prepared remarks, we have some acceptance based deals specifically related to the number portability work in India that we are not quite sure if it is going to be June or July. That is why we are going to have variability between Q2 and Q3. But we are pretty confident they are going to happen this year. [Emphasis added.]

35.     On May 6, 2010, in response to the adverse statements about the effects of emerging markets in general and India in particular on the Company's operating performance, the price of Tekelec stock dropped approximately 20% on very heavy volume to close at $14.10 per share, as a portion of the artificial inflation came out of the stock price. Defendants, however, continued to conceal the true scope of the problems impacting the Company's business.

36.     The statements referenced above in ¶¶ 25-27, 29 and 30-34 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was experiencing known but undisclosed difficulties in fulfilling orders in the emerging markets in general and India in particular due to security and regulatory issues;

- 17 -

(b)     that the Company's customers in the emerging markets were experiencing known but undisclosed credit issues causing them to delay purchases;

(c)     that the Company was experiencing a sharp decline in new orders that were reasonably likely to have a material adverse effect on the Company's backlog and operating results;

(d)     as a result of the foregoing, Defendants' representations concerning their "visibility" into the Company's earnings were materially false and misleading;

(e)     as a result of the foregoing, Defendant Plastina's representations that the emerging markets "remain strong" and that "our position in India and Brazil remains strong" were materially false and misleading;

(f)     as a result of the foregoing, Defendant Plastina's representations that the delays in Indian license awards "doesn't really impact our revenue because the revenue is based on customer acceptances, which is contractual" was materially false and misleading;

(g)     that Defendants' representations about its disclosure controls were materially false and misleading; and

(h)     that based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and growth.

37.     Then, on August 5, 2010, Tekelec issued a press release announcing its operating results for the quarter ended June 30, 2010, which stated, in part:

> Revenue for the second quarter of 2010 was $109.5 million, down 4% compared to $114.2 million for the second quarter of 2009. ***The Company's orders were $72.1 million for the quarter, down 31% from the second quarter of 2009. Order input was down primarily due to a reduction in SS7 and SIGTRAN orders in emerging markets, including ongoing delays caused by security- related regulations imposed by the Indian government. As of June 30, 2010, backlog was $271.6 million compared to $308.4 million as of March 31, 2010 and $353.3 million as of June 30, 2009.***

Gross margins for the second quarter of 2010 were 63%, compared to 67% in the second quarter of 2009. Non-GAAP gross margins for the second quarter of 2010 were 67%, compared to 68% for the second quarter of 2009. [Emphasis added.]

38.     That same day, Defendants held a conference call with securities analysts for

investors, which included, in pertinent part, the following prepared remarks by Defendant Plastina:

> However, order input fell short of expectations. We generated $72 million in orders for the second quarter. ***Our year-to-date orders of $129 million are down 25% compared to the same period last year***. As discussed on the previous call, we continue to see lower SIGTRAN SS7 solution orders primarily from emerging markets.
>
> In addition, ***order input in India continues to be impacted by the new security regulations imposed by the Indian government, as well as delays in the expected deployment of 3G networks***. ***These delays impacted the order input that we had expected from our base of customers in India during the first half.*** We are reviewing the most recent security-related regulations imposed by the Indian government, and although the impact of such regulations on our operations and order flows is uncertain, we expect improved order flow in the second half of 2010.
>
> Also the pipeline and quote activity for business in India is very healthy across many parts of our portfolio. Several of our customers in India have already consumed a signaling capacity purchased last year as part of their planned growth, including number portability.
>
> Despite the ongoing delays in order input, our work on the ground in India has continued. We recognized approximately $15 million of EAGLE and number portability-related revenue in India during the quarter. These revenues are reflected in our Q2 gross margin performance of 67%.
>
> ***Looking to other emerging market regions, the Middle East and Africa continue to be challenged with credit issues,*** forcing many service providers to delay purchases and run their networks at near capacity. As an example, we received approximately $4 million in orders from customers in this region during the quarter that we will not book until we have a clear view that payment will be secured. [Emphasis added.]

39.     On the same conference call with securities analysts, Defendant Plastina represented,

in pertinent part:

> <u>Larry Harris</u>  - CL King & Associates - Analyst:
>
> Yes, thank you. A couple of questions. One with respect to India. I know the security situation there is still evolving but how long under your current accounting rules, say before we might see a rebound in revenues? In other words, if this were to

- 19 -

be resolved in the next month or two, how long before we might see orders, then shipments, and could the revenues from the resolution of these issues occur in the fourth quarter, or might we be looking at the early next year?

Defendant Plastina:

Larry, this is really something that gets pushed out to 2011. Because right now if we get – *we're already in August, if we get orders from India, it's very difficult for us to turn those into revenue before the end of this year depending on the size of the orders. Obviously some smaller orders would be easier than others. So if it's going to take us another month or so to sort this out with the Indian -- with the customers and the Indian government or perhaps even longer, we're looking at revenues being pushed out to 2011 for any orders that come from India this year. That's reflected in our guidance today. So that 7% adjustment that we've made bringing the range down reflects the fact that we're not going to get those revenues in this year.* [Emphasis added.]

40.     In response to these statements, the price of Tekelec common stock fell more than 9% on heavy trading volume as the remaining artificial inflation came out of the stock price.

41.     The market for Tekelec common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Tekelec common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Tekelec common stock relying upon the integrity of the market price of Tekelec common stock and market information relating to Tekelec, and have been damaged thereby.

42.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Tekelec common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

43.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Tekelec's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Tekelec and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegations

44.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tekelec, their control over, and/or receipt and/or modification of Tekelec's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Tekelec, participated in the fraudulent scheme alleged herein.

45.     In addition, the alleged improprieties noted herein enabled certain Company insiders to sell almost $3.5 million in Tekelec stock:

| Last Name | First Name | Position | Date | Ownership | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|---|
| BUCKLY | RONALD | D | 02/16/10 | Direct | 2,000 | $16.73 | $33,460 |
| | | | 02/16/10 | Direct | 2,000 | $16.89 | $33,780 |
| | | | 03/05/10 | Direct | 6,000 | $18.25 | $109,500 |
| | | | | | 10,000 | | $176,740 |
| CLAUDY | WOLRAD | O,OX | 02/19/10 | Direct | 2,000 | $16.81 | $33,620 |
| | | | 02/19/10 | Direct | 1,300 | $16.82 | $21,866 |
| | | | 02/19/10 | Direct | 900 | $16.84 | $15,156 |
| | | | 02/19/10 | Direct | 800 | $16.83 | $13,464 |
| | | | 03/16/10 | Direct | 17,500 | $18.40 | $322,000 |
| | | | 03/19/10 | Direct | 1,307 | $18.29 | $23,905 |
| | | | 03/19/10 | Direct | 79 | $18.28 | $1,444 |
| | | | | | 23,886 | | $431,455 |
| DE LANGE | RONALD | O,OX | 03/03/10 | Direct | 6,755 | $17.91 | $120,982 |
| | | | 03/04/10 | Direct | 2,870 | $17.74 | $50,914 |
| | | | 03/12/10 | Direct | 62,500 | $18.51 | $1,156,875 |
| | | | | | 72,125 | | $1,328,771 |
| EVERETT | WILLIAM | CFO,O | 02/18/10 | Direct | 24,000 | $16.62 | $398,880 |
| | | | | | 24,000 | | $398,880 |
| KAPLAN | MARTIN | D | 02/19/10 | Direct | 2,500 | $16.96 | $42,400 |
| | | | 03/04/10 | Direct | 10,000 | $17.66 | $176,600 |
| | | | 03/11/10 | Direct | 5,000 | $18.36 | $91,800 |
| | | | | | 17,500 | | $310,800 |
| PLASTINA | FRANCO | CEO,P,OD | 02/17/10 | Direct | 2,000 | $16.65 | $33,300 |
| | | | 02/17/10 | Direct | 1,904 | $16.74 | $31,873 |
| | | | 02/17/10 | Direct | 1,900 | $16.75 | $31,825 |
| | | | 02/17/10 | Direct | 1,583 | $16.76 | $26,531 |
| | | | 02/17/10 | Direct | 113 | $16.66 | $1,883 |
| | | | 02/22/10 | Direct | 19,518 | $16.79 | $327,707 |
| | | | | | 27,018 | | $453,119 |
| RICE | DAVID | O,OX | 03/02/10 | Direct | 6,800 | $17.62 | $119,816 |
| | | | 03/02/10 | Direct | 1,200 | $17.64 | $21,168 |
| | | | 03/02/10 | Direct | 600 | $17.62 | $10,572 |
| | | | 03/02/10 | Direct | 400 | $17.63 | $7,052 |
| | | | | | 9,000 | | $158,608 |
| RUSH | GREGORY | O | 03/08/10 | Direct | 7,797 | $18.20 | $141,905 |
| | | | | | 7,797 | | $141,905 |
| WELLS | MARYKAY | CT,O | 03/02/10 | Direct | 3,390 | $17.38 | $58,918 |
| | | | 03/02/10 | Direct | 431 | $17.44 | $7,517 |
| | | | 03/02/10 | Direct | 200 | $17.39 | $3,478 |
| | | | | | 4,021 | | $69,913 |

|  |  |  |
|---|---|---|
| **Total:** | **195,347** | **$3,470,191** |

## Loss Causation/Economic Loss

46.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct, which artificially inflated the price of Tekelec common stock and operated as a fraud or deceit on Class Period purchasers of Tekelec common stock. Defendants failed to disclose known the credit, regulatory and security difficulties the Company was experiencing in the emerging markets, including Indian, that were have a material adverse effect on Teklec's orders, backlog and operations.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Tekelec common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Tekelec common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

47.     Defendants' false and misleading statements had the intended effect and caused Tekelec common stock to trade at artificially inflated levels throughout the Class Period.

48.     As a direct result of the disclosures detailed herein, the price of Tekelec common stock fell precipitously.  These declines removed the inflation from the price of Tekelec common stock, causing real economic loss to investors who had purchased Tekelec common stock during the Class Period.

49.     The declines in the price of Tekelec common stock after this disclosure came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price declines in Tekelec common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the

- 23 -

other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Tekelec common stock and the subsequent significant decline in the value of Tekelec common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

50.     At all relevant times, the market for Tekelec common stock was an efficient market for the following reasons, among others:

(a)     Tekelec common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     Tekelec filed periodic public reports with the SEC and the NASDAQ;

(c)     Tekelec regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Tekelec was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

51.     As a result of the foregoing, the market for Tekelec common stock promptly digested current information regarding Tekelec from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Tekelec common stock during the Class Period suffered similar injury through their purchase of Tekelec common stock at artificially inflated prices and a presumption of reliance applies.

- 24 -

**No Safe Harbor**

52.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Tekelec who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

- 25 -

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

56.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tekelec common stock. Plaintiff and the Class would not have purchased Tekelec common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

57.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Tekelec common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of Tekelec within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Tekelec, and their ownership of Tekelec stock, the Individual Defendants had the power and authority to cause Tekelec to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

- 26 -

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  January 6, 2010                   McDANIEL & ANDERSON, L.L.P.
                                          L. BRUCE McDANIEL


                                          _____
                                              */s/ L. Bruce McDaniel*
                                              L. BRUCE McDANIEL

                                          P. O. Box 58186
                                          Raleigh, NC  27658
                                          Telephone:  919/872-3000
                                          919/790-9273 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

SULLIVAN, WARD, ASHER & PATTON, P.C.
MICHAEL J. ASHER
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PIPEFITTERS LOCAL NO. 636 DEFINED BENEFIT PLAN ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Security            Transaction          Date              Price Per Share

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re Franklin Bank Corp. Sec. Litig.*, No. 4:08-cv-01810 (S.D. Tex.)
*In re Zale Corporation Sec. Litig.*, No. 3:09-cv-02133-B (N.D. Tex.)

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

TEKELEC

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___9___ day of ___DEC___, 2010.

PIPEFITTERS LOCAL NO. 636 DEFINED BENEFIT PLAN

By: _Frank Niechet_

Its: _Chairman_

By: _____

Its: _____

- 2 -

## SCHEDULE A

### SECURITIES TRANSACTIONS

#### Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/22/2010 - SD | 300 | $18.96 |
| 04/30/2010 - SD | 2,910 | $18.58 |
| 05/13/2010 - SD | 390 | $15.07 |

#### Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 02/19/2010 - SD | 300 | $16.89 |

*Opening position of 770 shares.

**Settlement dates are indicated with "SD" attached to the date.