UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

No. 5:11-cv-00004(D)

| | | |
|---|---|---|
| PIPEFITTERS LOCAL NO. 636 DEFINED BENEFIT PLAN, Individually and on Behalf of Itself and All Others Similarly Situated, | ) ) ) | CLASS ACTION |
| | ) | MEMORANDUM OF LAW IN OPPOSITION |
| Plaintiff, | ) ) | TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION |
| vs. | ) ) | COMPLAINT |
| TEKELEC, FRANCO PLASTINA, WILLIAM EVERETT and GREGORY RUSH, | ) ) ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................1

II.   STATEMENT OF FACTS ..........................................................................3

III.  ARGUMENT ...............................................................................................7

    A.    Legal Standards.................................................................................7

    B.    The Complaint Specifically Alleges Defendants' Fraud in Accordance with Rule 9(b) and the PSLRA ..........................................8

    C.    The Complaint Pleads Actionable Misstatements and Omissions........................11

          1.    Defendants' Statements Are Not Protected by the PSLRA's Safe Harbor Provision or the Bespeaks Caution Doctrine..................................13

          2.    Defendants' Statements Are Not "Puffery"................................19

          3.    Defendants' Statements of Opinion Are Actionable .................................21

    D.    Plaintiffs Have Sufficiently Alleged a §10(b) Claim Against Defendant Rush ...................................................................................23

    E.    The Complaint Alleges Specific Facts Giving Rise to a Strong Inference of Scienter ...........................................................................25

          1.    Defendants Knew or Recklessly Disregarded the Fact that the EAGLE Product Line Was Performing Poorly..........................................26

          2.    Defendants Knew or Recklessly Disregarded that New Security Regulations in India Were Negatively Impacting Tekelec's Business ...................................................................27

          3.    The Complaint Properly Relies on the Statements of Confidential Witnesses .................................................................29

          4.    Defendants' Stock Sales Further Support a Strong Inference of Scienter ...............................................................................31

          5.    Defendants' Positions Within the Company, Accompanied by Their Receipt of Internal Reports and Attendance at Meetings, Further Evidence Their Scienter .............................................................35

F. The Complaint Adequately Alleges Control Person Liability Under Section 20(a) of the Exchange Act .........................................................................37

IV. CONCLUSION..................................................................................................................37

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ............................................................................35

*Arlund v. Deloitte & Touche LLP*,
199 F. Supp. 2d 461 (E.D. Va. 2002) .............................................................27, 30

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ...........................................................................................7

*Asher v. Baxter Int'l, Inc.*
377 F.3d 727 (7th Cir. 2004) ...............................................................................13

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) ...............................................................36

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. Tex. 2005) .................................................................24, 25

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ..............................................................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................7

*Blatt v. Corn Prods. Int'l, Inc.*,
No. 05 C 3033, 2006 U.S. Dist. LEXIS 39383
(N.D. Ill. June 14, 2006) ......................................................................................13

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
No. 00-4285, 2002 WL 33934282
(D.N.J. June 26, 2002), *aff'd*, 394 F.3d 126 (3d Cir. 2004)................................35

*Chalverus v. Pegasystems, Inc.*,
59 F. Supp. 2d 226 (D. Mass. 1999) ....................................................................36

*City of Ann Arbor Emps. Ret. Sys. v. Sonoco Prods. Co.*,
No. 4:08-cv-2348-TLW-TER, 2009 U.S. Dist. LEXIS 74198
(D.S.C. Aug. 14, 2009) ...................................................................................11, 14

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)..................................................................20

- iii -

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) ............................................................................................35, 36

*Dunn v. Borta*,
    369 F.3d 421 (4th Cir. 2004) ...............................................................................................19

*Edwards v. City of Goldsboro*,
    178 F.3d 231 (4th Cir. 1999) ...............................................................................................37

*Epstein v. Itron, Inc.*,
    993 F. Supp. 1314 (E. D. Wash. 1998) ................................................................................36

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................................................34

*Garden City Employees' Ret. Sys. v. Psychiatric Sol.*,
    No. 3:09-00882, 2011 U.S. Dist. LEXIS 35661
    (M.D. Tenn. March 31, 2011)...............................................................................................34

*Gasner v. Board of Supervisors*,
    103 F.3d 351 (4th Cir. 1996) ...............................................................................................21

*Gross v. Medaphis Corp.*,
    977 F. Supp. 1463 (N.D. Ga. 1997) .....................................................................................15

*Higginbotham v. Baxter Int'l.*,
    495 F.3d 753 (7th Cir. 2007) ...............................................................................................31

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) .............................................................................................23

*Huttenstine v. Mast*,
    No. 4:05-CV-152-F(3), 2006 U.S. Dist. LEXIS 93844
    (E.D.N.C. Dec. 20, 2006).............................................................................................7, 8, 37

*In re Affiliated Computer Servs. Deriv. Litig.*,
    540 F. Supp. 2d 695 (N.D. Tex. 2007) .................................................................................24

*In re Allaire Corp. Secs. Litig.*,
    224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................................................21

*In re ArthroCare Corp. Secs. Litig.*,
    726 F. Supp. 2d 696 (W.D. Tex. 2010).................................................................................33

*In re Burlington Coat Factor Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)................................................................................12

*In re Catalina Mktg. Corp. Sec. Litig.*,
390 F. Supp. 2d 1110 (M.D. Fla. 2005)..................................................................20

*In re Champion Enters., Inc. Sec. Litig.*,
144 F. Supp. 2d 848 (E.D. Mich. 2001).................................................................16

*In re Computer Assocs. Class Action Sec. Litig.*,
75 F. Supp. 2d 68 (E.D.N.Y. 1999) .......................................................................21

*In re Constellation Energy Group, Inc.*,
738 F. Supp. 2d 614 (D. Md. 2010)........................................................................14

*In re Conventry Healthcare Sec. Litig.*,
2011 U.S. Dist. LEXIS 97246 ..........................................................................27, 30

*In re Conventry Healthcare Secs. Litig.*,
No. 08:09-CV-2337-AW, 2011 U.S. Dist. LEXIS 33808
(D. Md. Mar. 30, 2011)...........................................................................................19

*In re Cree, Inc. Sec. Litig.*,
333 F. Supp. 2d 461 (M.D.N.C. 2004) ...................................................................31

*In re Criimi Mae, Inc. Sec. Litig.*,
94 F. Supp. 2d 652 (D. Md. 2000) ...........................................................................8

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006).......................................................................16

*In re Globalstar Sec. Litig.*,
No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496
(S.D.N.Y. Dec. 15, 2003) ........................................................................................12

*In re Hi/fn, Inc. Sec. Litig.*,
No. C 99-4531 SI, 2000 U.S. Dist. LEXIS 11631
(N.D. Cal. Aug. 9, 2000)..........................................................................................21

*In re Honeywell Int'l Sec. Litig.*,
182 F. Supp. 2d 414 (D.N.J. 2002) ...........................................................................9

*In re Humphrey Hospitality Trust, Inc. Sec. Litig.*,
219 F. Supp. 2d 675 (D. Md. 2002) ........................................................................18

*In re IBM Corporate Sec. Litig.*,
　163 F.3d 102 (2d Cir. 1998)...........................................................................15

*In re Lab Corp. of Am. Holdings Sec. Litig.*,
　No. 1:03CV591, 2006 U.S. Dist. LEXIS 31232
　(M.D.N.C. May 18, 2006) ...........................................................................15

*In re Meta Fin. Group, Inc.*,
　No. 09 Civ. 6185, 2011 U.S. Dist. LEXIS 77811
　(N.D. Iowa July 18, 2011) ...........................................................................36

*In re MicroStrategy, Inc. Sec. Litig.*,
　115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................8, 11, 31, 32

*In re Nash Finch Co. Sec. Litig.*,
　502 F. Supp. 2d 861 (D. Minn. 2007)............................................................16

*In re Neopharm, Inc. Sec. Litig.*,
　No. 02 C 2976, 2003 U.S. Dist. LEXIS 1862
　(N.D. Ill. Feb. 7, 2003)...............................................................................18

*In re Nortel Networks Corp. Sec. Litig.*,
　238 F. Supp. 2d 613 (S.D.N.Y. 2003)............................................................14

*In re NTL Inc. Sec. Litig.*,
　347 F. Supp. 2d 15 (S.D.N.Y. 2004)..........................................................9, 10

*In re NutriSystem, Inc. Secs. Litig.*,
　653 F. Supp. 2d 563 (E.D. Pa. 2009) ............................................................34

*In re Orbital Sciences Corp. Sec. Litig.*,
　58 F. Supp. 2d 682 (E.D. Va. 1999) .....................................................31, 33, 34

*In re Oxford Health Plans, Inc.*
　187 F.R.D. 133 (S.D.N.Y. 1999) ..................................................................31

*In re PEC Solutions, Inc. Sec. Litig.*,
　418 F.3d 379 (4th Cir. 2005) .....................................................................7, 31

*In re Peoplesoft, Inc.*,
　No. C 99-00472 WHA, 2000 U.S. Dist. LEXIS 10953, 2000 WL 1737936
　(N.D. Cal. May 25, 2000) ...........................................................................27

*In re Pozen Sec. Litig.*,
   386 F. Supp. 2d 641 (M.D.N.C. 2005) ..........................................................................8, 22, 25

*In re Quintel Entm't Inc. Sec. Litig.*,
   72 F. Supp. 2d 283 (S.D.N.Y. 1999)......................................................................................32

*In re Regeneron Pharms., Inc. Sec. Litig.*,
   No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
   (S.D.N.Y. Feb. 3, 2005) .........................................................................................................17

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   351 F. Supp. 2d 334 (D. Md. 2004) .......................................................................................22

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).............................................................................................12, 32

*In re Scottish Re Group Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)....................................................................................37

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) .....................................................................................36

*In re Silicon Storage Tech, Inc. Sec. Litig.*,
   No. 05-2595, 2007 U.S. Dist. LEXIS 21953
   (N.D. Cal. Mar. 9, 2007).........................................................................................................28

*In re U.S. Interactive, Inc. Sec. Litig.*,
   No. 01-cv-522, 2002 U.S. Dist. LEXIS 16009
   (E.D. Pa. Aug. 23, 2002).........................................................................................................14

*In re ValuJet Inc. Sec. Litig.*,
   984 F. Supp. 1472 (N.D. Ga. 1997) ........................................................................................36

*In re Washington Mutual, Inc., Sec. Litig.*,
   No. 08-md-1919, 2009 U.S. Dist. LEXIS 99727
   (W.D. Wash. Oct. 27, 2009) ..........................................................................................27, 28

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................................................................24

*Kurtzman v. Compaq Computer Corp.*,
   No. H-99-779, 2000 U.S. Dist. LEXIS 22476
   (S.D. Tex. Dec. 12, 2000) .......................................................................................................18

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)..............................................................................19, 20

*Latham v. Matthews*,
   662 F. Supp. 2d 441 (D.S.C. 2009)............................................................................................9

*Lefkoe v. Jos. A. Bank Clothiers*,
   No. WMN-06-1892, 2007 U.S. Dist. LEXIS 98777
   (D. Md. Sept. 10, 2007) ................................................................................................. *passim*

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ...................................................................................................31

*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007)......................................................................................33

*Manavazian v. ATEC Group, Inc.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) .....................................................................................12

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*
   576 F.3d 172 (4th Cir. 2009) .....................................................................................................8

*Meckenstock v. Int'l Heritage, Inc.*,
   No. 5:98-CV-237-BR(2), 1998 U.S. Dist. LEXIS 21042
   (E.D.N.C. Dec. 9, 1998)......................................................................................................7, 24

*Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.*,
   523 F.3d 75 (1st Cir. 2009)......................................................................................................33

*Nolte v. Capital One Fin. Corp.*,
   390 F.3d 311 (4th Cir. Va. 2004).............................................................................................22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).....................................................................................................21

*Nursing Home Pension Fund, Local 144 v. Oracle*,
   380 F.3d 1226 (9th Cir. 2004) ...........................................................................................27, 28

*Ottmann v. Hanger Orthopedic Group, Inc.*,
   353 F.3d 338 (4th Cir. 2003) .............................................................................................11, 25

*Pearce v. UBS PaineWebber, Inc.*,
   No. 02-2409, 2003 U.S. Dist. LEXIS 26130
   (D.S.C. Oct. 31, 2003) ...............................................................................................................8

*Presley v. City of Charlottesville,*
464 F.3d 480 (4th Cir. 2006) .................................................................................7

*Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP,*
551 F.3d 305 (4th Cir. 2009) .................................................................................25

*Raab v. General Physics Corp.,*
4 F.3d 286 (4th Cir. 1993) .................................................................................15, 21, 22

*Ronconi v. Larkin,*
253 F.3d 423 (9th Cir. 2001) .................................................................................32

*Rubinstein v. Collins,*
20 F.3d 160 (5th Cir. 1994) .................................................................................31

*Schlifke v. Seafirst Corp.,*
866 F.2d 935 (7th Cir. 1989) .................................................................................18

*SEC v. Mozilo,*
No. CV 09-3994-JFW (MANx), 2010 U.S. Dist. LEXIS 98203
(S.D. Cal. Sept. 16, 2010) .................................................................................34

*Sgalambo v. McKenzie,*
739 F. Supp. 2d 453 (S.D.N.Y. 2010).................................................................................16

*Silverman v. Motorola, Inc.,*
No. 07 C 4507, 2008 U.S. Dist. LEXIS 76799
(N.D. Ill. Sept. 23, 2008) .................................................................................9

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*
365 F.3d 353 (5th Cir. 2004) .................................................................................23

*Stevelman v. Alias Research Inc.,*
174 F.3d 79 (2d Cir. 1999).................................................................................31

*Takara Trust v. Molex Inc.,*
429 F. Supp. 2d 960 (N.D. Ill. 2006) .................................................................................14

*Teachers' Ret. Sys.,v. Hunter,*
477 F.3d 162 (4th Cir. 2007) .................................................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007).................................................................................25, 29, 30

*Zuckerman v. Smart Choice Automotive Group, Inc.*,
   No. 99 CV 237 ORL 99A, 2000 U.S. Dist.LEXIS 13489
   (M.D. Fla. May 18, 2000) ......................................................................................................35

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78(j)(b) ...........................................................................................................................32
   §78u-4(b)(1) .......................................................................................................................8
   §78u-4(b)(2) .......................................................................................................................8
   §78u-5(1)(A)(i) .................................................................................................................16
   §78u-5(c)(1)(A)(i) .............................................................................................................13
   §78u-5(c)(1)(B) .................................................................................................................13

Federal Rules of Civil Procedure
   Rule 9(b) ................................................................................................ *passim*
   Rule 10b-5 ........................................................................................................................15
   Rule 10b5-1 .......................................................................................................................34
   Rule 12(b)(6) .......................................................................................................................7
   Rule 15(a) ..........................................................................................................................37

Lead Plaintiffs Pipefitters Local No. 636 Defined Benefit Pension Fund ("Pipefitters") and Norfolk County Retirement System ("Norfolk") (together, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (cited herein as "Complaint" or "¶__" and "Def. Mem. at __," respectively) filed by Defendants Tekelec ("Tekelec" or the "Company"), Franco Plastina ("Plastina"), William Everett ("Everett") and Gregory Rush ("Rush")[1] (collectively, "Defendants").

## I.    INTRODUCTION

This is a securities class action on behalf of purchasers of the publicly-traded common stock of Tekelec – a global provider of communications products – between February 11, 2010 and August 5, 2010, inclusive (the "Class Period"). As set forth at length in the Complaint, throughout the Class Period, Defendants made numerous positive representations to investors about the strength and growth of the Company's EAGLE product line, as well as the Company's growing business in India. These representations, however, were either not true or were misleading.

Indeed, the Complaint details how multiple former employees of the Company, in positions to know, have corroborated one another in describing how even prior to the start of the Class Period, it was well-known internally that Tekelec's EAGLE 5 product was at its end in sales growth, and that the Company's new product, EAGLE XG, was not making up for the difference. Multiple witnesses also confirm that the Individual Defendants – who were directly responsible for the Company's financial projections and who were briefed on and had access to weekly and daily data concerning revenue and products – would have had access to this adverse information before making their public statements to investors. Also, since the Company's revenues were based on the backlog of orders the Company already had, any projections of revenue based on that existing backlog could be accurately assessed and would have been known to Defendants. Thus, Defendants' Class Period statements about the Company's

---

[1]  Plastina, Everett and Rush are collectively referred to herein as the "Individual Defendants."

strength in its Eagle product line were knowingly false when made.

Defendants' positive statements about the Company's growing business in India fare no better. In December 2009 – before the start of the Class Period – India instituted new regulations that required companies like Tekelec to obtain security clearances before accepting Indian orders. Notably, the Company did not receive *any* security clearances during the Class Period, during 2010, or at all as of the date of the Complaint. ¶98. Defendants themselves point to a letter that states if no response is received within 30 days, the security clearance can be assumed. Because the Company did not receive any security clearances during the Class Period, the *only* compelling inference is that they received responses indicating further delays, which were not timely disclosed to the market. In fact, the first public disclosure of any delays regarding orders in India due to the regulations and security clearances did not take place until May 2010, halfway through the Class Period and over five months after the regulation was instituted. As such, Defendants' positive statements about the Company's growth in India during the Class Period – without disclosing that security delays were negatively impacting the Company's growth – were materially false and misleading.

While the price of Tekelec stock was artificially inflated because of Defendants' false statements and omissions, the Individual Defendants were able to sell over $3.7 million worth of their personally-held Tekelec stock. Defendant Rush, at two different times during the Class Period, liquidated his entire holdings in Tekelec stock.

In the face of these well-pled allegations, Defendants filed their motion to dismiss contending that Plaintiff has not alleged actionable misstatements and that Plaintiffs have failed to allege a strong inference of scienter, *i.e.*, a strong inference that the Defendants knew or were severely reckless in not knowing the true nature of the Company's financial condition during the Class Period. As demonstrated above, and in more detail below, Defendants' arguments are simply not supported by the allegations.

Accordingly, since Plaintiffs' allegations have met the requirements of the Private Securities Litigation Reform Act (the "PSLRA") and Federal Rule of Civil Procedure 9(b), Defendants' motion to dismiss should be denied in its entirety.

## II. STATEMENT OF FACTS

Tekelec is a global provider of telecommunications products, including systems and software that support signaling networks. ¶¶2, 23. Tekelec designs, develops, manufactures, and supports these products for wireless and landline service providers around the world. ¶3. Signaling software and systems are a core business of Tekelec, and the Company's principal signaling network software includes the EAGLE 5 and EAGLE XG product families. ¶¶27-28. EAGLE 5 has historically been Tekelec's principal signaling platform, introduced as early as 2001. ¶28. EAGLE XG was introduced in 2008 to keep pace with customers' evolving needs and offers a portfolio of products to support Internet Protocol ("IP") architectures and the migration to IP-based networks which EAGLE 5 did not support. *Id.*

In 2009, international markets, like India, represented 61 percent of the Company's total revenues. ¶3. Tekelec's "backlog" is the total value of sales orders that have already been booked and are waiting to be filled. ¶29. Once an order has been satisfied, the Company can recognize the revenue. *Id.* The majority of revenue that Tekelec recognizes during a quarter is directly tied to this backlog of existing orders. ¶30.

Prior to the beginning of the Class Period, in 2009, Tekelec was aggressive in garnering business in India once that country mandated number portability. ¶33. Tekelec saw business in India as an emerging market and announced that it was "especially pleased" with its growth in this market. ¶34. On December 9, 2009, however, the Indian government required all foreign licensed cellular mobile telephone service providers, like Tekelec, to apply for and receive a security clearance for equipment/software before an order could be placed. ¶35. Since Tekelec had been doing business in India since 2004, Defendants were aware that lengthy regulatory delays in India are commonplace. ¶36. In addition, the Indian government's letter noted that if the applicant received no response within 30

- 3 -

days, the security clearance could be assumed. *See* Exhibit C to the Declaration of Carl E. Volz in Support of Defendants' Motion to Dismiss the Complaint, dated August 29, 2011 ("Volz. Dec."). As of June 30, 2011, over one year after Defendants insisted the security clearance would be forthcoming, the Company had not received clearance. ¶98.

Prior to the start of the Class Period, there was also evidence that equipment sellers to India were experiencing delays based upon information being incomplete in their applications for security clearance. ¶36. According to a preeminent scholar in the field of Indian regulatory law: (1) it should have been understood by telecom providers, including Tekelec, that the Indian government security regulations would result in delays in the booking of new orders by at least six months (and likely significantly longer); and (2) it was not reasonable for Tekelec to expect security clearance within 30 days. ¶¶43-55.

Despite these known facts, during the Class Period, Defendants did not disclose the significant delays Tekelec's business in India would experience. Instead, Defendants noted that "number portability success in India continues" and that Tekelec's "position in India . . . remains strong." ¶¶68-69. In addition, Defendants described the Company's business in India as "very good" and a "growth driver." ¶78. Defendants were finally forced to disclose in May 2010 that "new regulations resulted in the delay of approximately $10 million of orders." ¶85. This partial disclosure caused the Company's stock to decline as Defendants continued to mislead investors, stating that the Company would "receive these orders during the current quarter." *Id.*

During the Class Period, the orders and revenue of the Company were tracked very carefully and Defendants were acutely aware of where Tekelec stood with respect to those key metrics. First, the fact that the Company's revenues were based upon an existing backlog of orders kept Defendants fully aware of the current status of revenues. ¶¶29-32. Weekly revenue meetings were held every Friday during the Class Period. ¶¶60-61. Defendants' representatives attended the meetings where all the pending orders from each region were reviewed and reported back to Defendants who were responsible for making the Company's financial projections. ¶¶60-61, 63. At the revenue meetings, a "scorecard" of every order

- 4 -

the Company had was distributed and reviewed. ¶62. These scorecards would state whether an order was definitely going to be paid by quarter end, whether the payment was a long shot or whether there was a high probability of payment by quarter end. *Id.* The scorecard also included the target revenue provided to the market and an opportunity list or value process management which detailed pre-orders. *Id.* Throughout the Class Period, Defendants were included on the emails distributing the scorecards. *Id.* Based upon this, Defendants were aware of: (i) how each order and each product at Tekelec was performing; (ii) the number of orders coming in; and (iii) the amount of revenue being recognized on a weekly basis. ¶64. Based upon the scorecards, Defendants were also aware of what could be expected in terms of new orders coming in. *Id.*

Tekelec also held weekly product meetings in the main boardroom of Tekelec in which the status of products, including financial information, what was in the pipeline, future delivery dates and any issues associated with delivery, were discussed. ¶¶65-66. This information would be put into an executive summary. ¶65. In other words, revenue was being reviewed constantly.

Prior to the start of the Class Period, EAGLE 5 was considered a legacy product, meaning that sales of the equipment had been saturated and that Tekelec needed a new product to take its place. ¶56. This was evident because training jobs on EAGLE 5 had dried up towards the end of 2009, and were steadily declining throughout the Class Period. ¶¶56-59. By the start of the Class Period, it was common knowledge that the EAGLE 5 training team would soon be laid off because the product had reached its peak and there were basically no more customers to purchase the product. ¶56. All EAGLE 5 trainers were laid off by July 2010. *Id.* EAGLE XG, a product designed to replace the EAGLE 5 product, was released in 2008, and missed its revenue projections in 2008 and 2009. ¶58. EAGLE XG never took off and did not sell as well as management had hoped. *Id.*

Because of the declining sales of the EAGLE products, prior to the Class Period, and likely continuing during the Class Period, Tekelec took on numerous high risk deals and lowered its credit

standards in order to extend the life of EAGLE 5. Tekelec's CFO (Everett and Rush) were required to approve the high risk deals, and the two "got very intimate" with the high risk deals. ¶59.

Despite these known facts, during the Class Period, Defendants continuously touted the success and growth from the EAGLE product line based on "improved visibility." ¶¶67-68, 73, 76. Defendants discussed the strength of the Company's EAGLE 5 business and said that the "business will continue to be a pretty standard and robust business for us," denying a "softening demand" for EAGLE 5 and noting Tekelec's "solid US business, including EAGLE 5." ¶¶80, 86. Even when Defendants first discussed a decline in EAGLE 5 revenues, on May 6, 2010, they misleadingly attributed the decline to "timing of the completion of a number of large acceptance based projects in the first quarter of 2009," rather than lack of market demand. ¶¶84, 87.

Prior to the May 6, 2010 disclosure, in the first three months of the Class Period, the Individual Defendants were able to dump 129,921 shares of their Tekelec stock for proceeds of $2,183,479.48. ¶104. Before the entire truth was disclosed to the market, Defendants were able to unload an additional 102,028 shares of Tekelec stock for additional proceeds of $1,530,439.17. *Id.* Defendant Rush unloaded all of his stock on March 8, 2010, and when he acquired additional restricted stock, sold completely out of the Company's stock again on May 20, 2010. Rush, therefore, was able to unload 100% of his liquid holdings in Tekelec on two occasions during the Class Period. ¶105. In total, Defendants sold over $3.7 million worth of Tekelec stock during the short 6-month Class Period.

On August 3, 2010, an article in *USA Today* disclosed that billions of dollars worth of orders in India were languishing away awaiting security clearance. ¶88. As the market began to put together what this meant for Tekelec's business in India, the next day, Tekelec stock dropped $0.52 per share, or 3.64%, on unusually heavy trading. Two days after the article, Defendants were forced to admit that the security regulation delays were ongoing and also that orders for EAGLE 5 were down. ¶90. Defendants adjusted their 2010 guidance down significantly, admitted that if the Company was able to get any orders from India, they would be pushed out to 2011, and that customers were limiting their purchases of

- 6 -

EAGLE 5 products. ¶¶90-94. This was the first time investors learned the true effect of the security regulations in India and that the EAGLE 5 product was obsolete and could no longer generate the amount of orders and revenue that Defendants had led the investing public to believe it could. ¶95. As a result of these disclosures, Tekelec stock fell more than 9%, or $1.29 per share, on unusually heavy trading volume. ¶96. As a result of the problems experienced by Tekelec in 2010, Defendant Plastina resigned effective January 4, 2011.

## III. ARGUMENT

### A. Legal Standards

In considering a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "must construe the complaint liberally in the light most favorable to the plaintiff and assume all the factual allegations of the complaint to be true." *Huttenstine v. Mast*, No. 4:05-CV-152-F(3), 2006 U.S. Dist. LEXIS 93844, at *6 (E.D.N.C. Dec. 20, 2006);[2] *see also In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 387 (4th Cir. 2005). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). Accordingly, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) ("*Twombly*"), but rather must simply "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. 544, 570 (2007)).

On a motion to dismiss a federal securities fraud action, in addition to the well-settled Rule 12(b)(6) standards, the Court must also consider the heightened pleading standards of the PSLRA and Fed. R. Civ. P. 9(b). *See Meckenstock v. Int'l Heritage, Inc.*, No. 5:98-CV-237-BR(2), 1998 U.S. Dist.

---

[2] Citations and internal quotation are omitted, unless otherwise noted.

LEXIS 21042, at *8-*9 (E.D.N.C. Dec. 9, 1998). A complaint satisfies the PSLRA where, like here, it: (i) "specif[ies] each statement alleged to have been misleading, [and] the reasons why the statement is misleading," 15 U.S.C. §78u-4(b)(1); and (ii) "state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *see also Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.* 576 F.3d 172, 181-82 (4th Cir. 2009). The PSLRA is also satisfied if when "an allegation regarding the statement or omission is made on information and belief, the complaint . . . state[s] with particularity all facts on which that belief is formed." *Id.*; *see also In re Pozen Sec. Litig.*, 386 F. Supp. 2d 641, 643 (M.D.N.C. 2005). Moreover, Fed. R. Civ. P. 9(b) is satisfied when "the circumstances constituting fraud or mistake [are] . . . stated with particularity in the complaint." *Huttenstine,* 2006 U.S. Dist. LEXIS 93844, at *6-*7. Even in light of these standards, neither the PSLRA nor Rule 9(b) require a plaintiff "to plead detailed evidentiary matter in order to survive a motion to dismiss" or to "set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants." *Pozen Sec. Litig.*, 386 F. Supp. 2d at 646 n.2.

As discussed below, the Complaint satisfies the Federal Rules of Civil Procedure and the PSLRA's pleading standards. Thus, the motion to dismiss should be denied in its entirety.

### B. The Complaint Specifically Alleges Defendants' Fraud in Accordance with Rule 9(b) and the PSLRA

Plaintiffs have satisfied both the PSLRA and Rule 9(b) standards for pleading falsity by "set[ting] forth the time, place, and content of the misrepresentations which constitute the alleged fraud." *Pearce v. UBS PaineWebber, Inc.*, No. 02-2409, 2003 U.S. Dist. LEXIS 26130, at *10 (D.S.C. Oct. 31, 2003). Plaintiffs have further complied with the PSLRA and Rule 9(b) by describing with particularity "the manner in which the statements are false and the specific facts raising an inference of fraud." *In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 657 (D. Md. 2000); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 628 (E.D. Va. 2000). Plaintiffs' Complaint clearly identifies each statement alleged to be false, when it was made, who made it, and why the alleged misstatements were false and

misleading when made. ¶¶67-87. That is all that is required under both the PSLRA and Fed. R. Civ. P. 9(b). *See Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892, 2007 U.S. Dist. LEXIS 98777, at *18 (D. Md. Sept. 10, 2007) (holding that plaintiffs had alleged falsity with the requisite particularity where, "[f]or each alleged misrepresentation, Plaintiffs . . . identified the speaker and stated where and when the statements or omissions were made" and also "contrasted the statements and omissions alleged in the [complaint] with the alleged personal knowledge of Defendants"); *see also Latham v. Matthews*, 662 F. Supp. 2d 441, 456-57 (D.S.C. 2009) (upholding §10(b) claims where the complaint listed 36 public statements made over the course of a four year class period, which fell "roughly . . . into four categories" and were alleged to be false and misleading for nine reasons).

Nevertheless, rather than focus their arguments on substantive grounds, Defendants attack Plaintiffs' use of "block-quote[s]" and contend that the Complaint does not sufficiently "allege the specific parts of the[] statements [Plaintiffs] believe are false and misleading." Def. Mem. at 25. However, when it suits them, Defendants have no difficulty identifying the very statements they contend are not specified as false and misleading. *See, e.g.*, Def. Mem. at 33, (disputing the materiality of the alleged false and misleading statements concerning Tekelec's business in India and EAGLE product line). Defendants cannot seriously contend that the Complaint fails to specify the statements at issue, on the one hand, while disputing the materiality of those very statements, on the other. *See In re Honeywell Int'l Sec. Litig.*, 182 F. Supp. 2d 414, 426 (D.N.J. 2002) (rejecting similar language).

Moreover, and contrary to Defendants' assertions, the statements Plaintiffs allege are actionable in the Complaint are emphasized in bold and italicized text and, thus, are readily identifiable. *See Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 U.S. Dist. LEXIS 76799, at *24 (N.D. Ill. Sept. 23, 2008) ("As we understand the complaint, plaintiffs are not alleging that the entire paragraphs are false, but only the highlighted statements. . . ."); *see also In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004) (rejecting defendants' argument that plaintiffs failed to plead with particularity and reproduced "blocks of text from allegedly deceptive NTL statements without specifying which portions

- 9 -

are misleading," finding that it was enough that the complaint specifically identified "the date, publication and speaker of each of the alleged misstatements or omissions").

For example, the Complaint alleges that Defendants consistently made positive statements concerning the Company's 2010 financial guidance and success with its EAGLE product line. *See, e.g.*, ¶¶67-68 (stating that "based on improved visibility . . . full year revenues [for 2010] will range between $470 and $480 million"); ¶¶73, 76 (touting the "success" of the EAGLE product line and expected "growth to come from those products"); ¶80 (discussing the strength of Tekelec's EAGLE 5 business and stating that the "business will continue to be a pretty standard and robust business for us"); and ¶86 (denying a "softening demand" for EAGLE 5 and noting Tekelec's "solid US business, including EAGLE 5"). It also clearly alleges that Defendants' statements identified above were false and misleading because: (i) they concealed the fact that the EAGLE 5 was quickly becoming obsolete and that sales were dramatically declining, ¶¶72, 75, 77, 81, 87; and (ii) as confirmed by former employees, EAGLE 5 had reached its saturation point by the end of 2009 and was "steadily losing business" throughout the Class Period. ¶¶56-58. Moreover, Defendants' statements obscured the fact that EAGLE XG was not generating significant orders or revenue to compensate for the loss of business in EAGLE 5, *id.,* and even when Defendants first discussed a decline in EAGLE 5 revenues on May 6, 2010, they misleadingly attributed the decline to "timing of the completion of a number of large acceptance based projects in the first quarter of 2009," rather than lack of market demand. ¶¶84, 87.

The Complaint further describes how Defendants' Class Period statements portrayed Tekelec's business in India in a positive light, *see, e.g.,* ¶¶68-69 (noting that "number portability success in India continues" and that Tekelec's "position in India . . . remains strong") and ¶78 (describing Tekelec's business in India as "very good" and a "growth driver"), and clearly describes how those statements fraudulently misled investors regarding the true state of Tekelec's business in India. In truth, Defendants knew that security regulations in India were causing delays in a material number of orders for Tekelec and, in fact, at the time Defendants made their positive statements, no new orders from Indian customers

- 10 -

had been booked by Tekelec. ¶¶72, 75, 77, 79. The Complaint further alleges that when Defendants were finally forced to disclose that the "new regulations resulted in the delay of approximately $10 million of orders," they continued to mislead investors, stating that Tekelec would "receive these orders during the current quarter," ¶85, when Defendants knew, however, that the security clearance issues would not be resolved until at least the second half of 2010, if not later. ¶87. Plaintiffs have thus satisfied both the PSLRA and Rule 9(b) by setting forth the time, place and content of the misrepresentations which constitute the alleged fraud.

### C. The Complaint Pleads Actionable Misstatements and Omissions

Despite Defendants' argument to the contrary, the statements challenged in the Complaint are material and actionable. A statement or omission is material "if there is a substantial likelihood that a reasonable [investor] (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *City of Ann Arbor Emps. Ret. Sys. v. Sonoco Prods. Co.*, No. 4:08-cv-2348-TLW-TER, 2009 U.S. Dist. LEXIS 74198, at *8 (D.S.C. Aug. 14, 2009) (quoting *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003)). The materiality inquiry is a fact-specific determination and, accordingly, is inappropriate for consideration on a motion to dismiss unless the statements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *MicroStrategy, Inc.*, 115 F. Supp. 2d at 657; *see also City of Ann Arbor Emps. Ret. Sys.,* 2009 U.S. Dist. LEXIS 74198, at *8 ("[o]nly if no reasonable juror could determine that the [alleged statements] would have assumed actual significance in the deliberations of the reasonable [investor] should materiality be determined as a matter of law."). This is not one of those rare situations in which the determination of materiality should be made on the basis of the pleadings alone.

Plaintiffs allege that Defendants' statements omitted or downplayed the very significant delays Tekelec was experiencing in India, as well as the declining sales of its EAGLE product line, which both

- 11 -

contributed to the Company's failure to meet its 2010 projections. These false statements and omissions precluded investors from obtaining a clear understanding of the Company's business operations and projected results and, accordingly, were precisely the type of information that an investor would have deemed material. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (finding information about a company's declining sales and increasing returns material); *In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496, at *29 (S.D.N.Y. Dec. 15, 2003) (failure to disclose a delay in the Company's rollout of its gateways was material). By misrepresenting or refusing to provide material information to shareholders concerning Tekelec's business in India and EAGLE product line, Defendants significantly altered the "total mix" of information available to potential investors. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Moreover, the market reaction to the truth about the Company's business in India and its EAGLE product line shows that investors thought the information was material. Courts recognize that, in an efficient market, "the concept of materiality translates into information that alters the price of the firm's stock." *In re Burlington Coat Factor Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997); *see also Manavazian v. ATEC Group, Inc.*, 160 F. Supp. 2d 468, 483 (E.D.N.Y. 2001) ("A dramatic change in the value of a company's stock following a company announcement . . . supports the materiality of the announcement."). While Tekelec's stock rose by more than 13% in response to positive statements made on February 11, 2010 (¶71), once Defendants partially disclosed some delays due to the new Indian security regulations on May 6, 2010, Tekelec's stock dropped over 19% (¶11). However, it was not until August 5, 2010, when Tekelec significantly decreased its 2010 guidance and announced that the Company's orders were down 31% from the second quarter of 2009, that the full extent of Tekelec's problems became apparent. ¶¶90-91. As a result of a series of disclosures beginning on August 3, 2010, Tekelec's stock dropped an additional 13%. ¶¶13-14, 88-96. These dramatic stock price reactions clearly demonstrate that the market viewed Defendants' statements as material.

Thus, there is no set of facts under which Defendants could establish that their misleading statements and omissions were "obviously unimportant" to investors. Nevertheless, Defendants argue that their statements were immaterial because they were either: (i) forward-looking in nature and accompanied by cautionary language; (ii) non-actionable puffery; or (iii) accurate statements of historical fact or opinion. Defendants' arguments are without merit and fail to mitigate the harm caused by their materially misleading statements and omissions during the Class Period.

### 1. Defendants' Statements Are Not Protected by the PSLRA's Safe Harbor Provision or the Bespeaks Caution Doctrine

Defendants erroneously contend that the "vast majority" of their challenged Class Period statements are "forward-looking statements" protected by the "safe harbor" provision of the PSLRA and the related "bespeaks caution" doctrine. Def. Mem. at 26-27. To qualify for safe-harbor protection, a forward-looking statement must be identified as such, and be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1)(A)(i). Further, forward-looking statements that are known to be false and misleading at the time they are made are not protected by the PSLRA's safe harbor. *See* 15 U.S.C. §78u-5(c)(1)(B). Accordingly, the safe harbor cannot immunize Defendants from liability for their false and misleading statements because: (1) most of their statements are misstatements of existing fact that are plainly not protected by the PSLRA's safe harbor or the bespeaks caution doctrine; (2) Defendants' forward-looking statements were not accompanied by cautionary language; and (3) Defendants' representations were knowingly false when made.[3]

---

[3] In any event, Defendants' argument for safe harbor protection is premature. *See Lefkoe*, 2007 U.S. Dist. LEXIS 98777, at *21 n.10 ("the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss"); *see also Asher v. Baxter Int'l, Inc.* 377 F.3d 727, 734 (7th Cir. 2004); *Blatt v. Corn Prods. Int'l, Inc.*, No. 05 C 3033, 2006 U.S. Dist. LEXIS 39383, at *18 (N.D. Ill. June 14, 2006) ("[W]hether the cautions at issue here were adequate is not a question to be answered on a motion to dismiss . . . . The sufficiency of Defendants' cautionary tone (if, indeed, one was required) is a question of fact, or possibly a question of law, that can be answered only on a more developed record."). At this preliminary pleading stage, the Court should reject Defendants' safe harbor argument on its face.

First, only forward-looking statements are even arguably entitled to safe-harbor protection or the bespeaks caution doctrine.[4] *See Lefkoe,* 2007 U.S. Dist. LEXIS 98777, at *21 n.10; *City of Ann Arbor Emples. Ret. Sys. v. Sonoco Prods. Co.*, No. 4:08-cv-2348-TLW-TER, 2009 U.S. Dist. LEXIS 74198, at *5 (D.S.C. Aug. 14, 2009). Contrary to Defendants' assertions, many of the statements alleged to be actionable are not forward-looking at all, but, rather, are statements of current or historical fact. For example, the alleged false and misleading statements regarding Tekelec's business in India – *e.g.*, "number portability success in India ***continues***;" "We are . . . ***pleased with our growth*** in the emerging markets such as India . . ." ". . . the emerging markets ***remain strong***. In particular our position in India . . .;" and India is "very ***good business*** for us, and we see that as a growth driver for our business going forward"[5] (¶¶68-69, 78) – are clearly statements of present or historical fact, not future projections. Similarly, Defendants' statements regarding its EAGLE products also concern past or present facts. *See, e.g.,* ¶73 ("our EAGLE 5 Product Family ***is successful*** because . . . [it] is able to meet the rigorous technological demands of rapidly growing global service providers and their networks"); ¶76 ("we ***got some very good traction*** with what we call our growth products. . . . defined as EAGLE XG . . ."); ¶80 ("our traditional SS7 TDM [EAGLE 5] business ***has been very strong*** . . . . That business will continue to be a pretty standard and robust business for us."); ¶84 ("Our 2010 ***revenues were negatively impacted***

---

[4] Thus, Defendants' ***omissions*** that new security regulations in India were having a significant adverse effect on Tekelec's business and that sales for Tekelec's EAGLE product line were decreasing are not protected by the safe-harbor provision of the PSLRA. *See In re Constellation Energy Group, Inc.*, 738 F. Supp. 2d 614, 625 (D. Md. 2010) (noting that the "safe harbor provision of the PSLRA and the bespeaks caution doctrine . . . apply to forward-looking statements only, and not to material omissions or misstatements of historical fact"); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006) (holding that "it is axiomatic that the failure to make a statement cannot be forward-looking").

[5] Such statements that incorporate forward-looking aspects within existing facts are not protected by the safe harbor. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) ("[I]t is well recognized that even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply."); *In re U.S. Interactive, Inc. Sec. Litig.*, No. 01-cv-522, 2002 U.S. Dist. LEXIS 16009, at *56 n. 11 (E.D. Pa. Aug. 23, 2002) ("Defendants cannot convert a larger statement containing a series of misstatements about current factual conditions into one forward-looking statement simply by including one statement that is clearly forward-looking").

by a decrease in Eagle 5 signaling revenues . . . primarily *due to the timing* of the completion of a number of large acceptance based projects . . ."); and ¶86 ("We *saw a pretty solid US business, including EAGLE 5*.").  As such, none of these statements are even arguably entitled to safe-harbor protection.  *See Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1473 (N.D. Ga. 1997) ("[T]he statutory safe harbor, like the "bespeaks caution" doctrine, does not insulate defendants from private securities liability based on statements that misrepresent historical/hard or current facts.").

　　The only statements at issue which may properly be considered forward-looking are statements concerning Tekelec's financial guidance for 2010 (*see* ¶¶67-68, 83), which are not protected by the PSLRA's safe harbor because they were not accompanied by meaningful cautionary language.[6]  To be meaningful, cautionary language must "convey[] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement."  *In re Lab Corp. of Am. Holdings Sec. Litig.*, No. 1:03CV591, 2006 U.S. Dist. LEXIS 31232, at *18 (M.D.N.C. May 18, 2006).

　　Here, Defendants' "cautionary language" is anything but meaningful.[7]  While Defendants attempt to create significance out of the risk factors included in the Company's 2009 Form 10-K and 2010 1Q Form 10-Q (*see* Def. Mem. at 29-32), referenced generally in the boilerplate language attached to its Class Period press releases and analyst call, these warnings failed to specifically caution investors of the

---

[6] Defendants wrongly contend that financial projections are "immaterial as a matter of law under Fourth Circuit precedent."  Def. Mem. at 29, n.25.  The precedent to which Defendants cite, *Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir. 1993), merely states that "projections of future performance not worded as guarantees are *generally* not actionable under the federal securities laws."  *Id.* at 290 (emphasis added).  However, "[s]tatements that are opinions or predictions are not per se inactionable under the securities laws."  *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).  In fact, "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."  *Id.*

[7] While Defendants assert that the "vast majority" of Defendants' statements are forward-looking, they only reference purported cautionary language with respect to three statements: (1) expected full year revenue for 2010 (¶¶67-68, 83); (2) an expected one to one book to bill ratio (*id.*); and (3) expected timing of delayed Indian orders (¶¶82, 85).  *See* Def. Mem. at 29, 31.

- 15 -

true risks the Company faced during the Class Period.[8]  For example, the generic boilerplate warning that "international markets have inherent risks, which could adversely affect our business" and risks of "greater trade regulations" or "trade barriers imposed by foreign countries" (Def. Mem. at 30) are insufficient to bring the challenged statements within the bounds of the PSLRA safe harbor.  *See, e.g., In re Champion Enters., Inc. Sec. Litig.*, 144 F. Supp. 2d 848, 859 (E.D. Mich. 2001) ("[T]here must be more than a recitation of mere generalized risks applicable to any business venture, such as the state of the economy.").  Indeed, Tekelec included virtually identical warnings in its 2007 and 2008 annual reports on Form 10-K, before the security regulations were even issued.  *See* Declaration of David A. Rosenfeld in Support of Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Complaint, dated October 31, 2011, Ex. A at p. 25 and Ex. B at p.27; *see also Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478-79 (S.D.N.Y. 2010) (cautionary language that "remained constant throughout the Class Period, even as the risks confronting . . . [the company] changed" was insufficient).  As a result, Tekelec's warnings were not reflective of changing market conditions and did not provide meaningful caution as to the true state of Tekelec's business in India.

Similarly, the language found in Defendants' 2009 Form 10-K, which Defendants assert was "incorporated by reference" in Tekelec's February 11, 2010 press release and conference call, was ineffective because it failed to disclose that the stated "risk factors were not hypothetical (*i.e.*, they 'could happen'), but were in fact happening."  *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102-03 (S.D.N.Y. 2006); *see also In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) (holding that "if Defendants knew that the specific risks and uncertainties stated to be 'potential' in

---

[8]  Defendants' efforts to incorporate by reference the cautionary language in Tekelec's 2009 Form 10-K with respect to the forward-looking statements made in its February 11, 2010 press release and conference call are unavailing.  The 2009 Form 10-K was not filed until February 25, 2010, **after** the statements were made.  Thus, the February 11, 2010 statements were not "accompanied by" the 2009 Form 10-K warnings, as required by 15 U.S.C. §78u-5(1)(A)(i), and thus could not possibly have warned of the problems the Company was facing.

their cautionary language had already been realized, and that their forward-looking statements were false and misleading, then their forward-looking statements were not protected by the safe harbor."). For example, Defendants' purported warnings that Tekelec's "revenues **may suffer if demand**" for its EAGLE products declines and "our future financial performance **will depend** in significant part on the successful and timely development, introduction and customer acceptance of new and enhanced versions of our EAGLE 5" (*see* Def. Mem. at 30) did not sufficiently warn investors about the impact of what Defendants already knew, namely, that at the time the statements were made, demand for Tekelec's EAGLE 5 products was **currently** declining and the EAGLE XG was not generating enough revenue to compensate for the loss of business in EAGLE 5. *See In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at *54 (S.D.N.Y. Feb. 3, 2005) ("[a] warning that fails to disclose specific known facts is insufficiently precise").

Moreover, Defendants' "warnings" in its 2009 Form 10-K were made alongside other positive statements about the EAGLE product line, including statements that Tekelec "expect[s] that these products will continue to account for a majority of our product revenues for the foreseeable future" and "we have experienced significant growth in our international revenues and, as much of this growth has been derived from sales of EAGLE 5 initial systems, we believe that we are building a base for future revenues from our higher margin extension business and other products in our portfolio." Volz. Dec., Ex. I, pp. 18, 40.

The remaining "cautionary statements," which Defendants contend were made in Tekelec's 1Q Form 10-Q, were not cautionary at all, but, rather, false and misleading with respect to the true scope of the ongoing problems with Tekelec's EAGLE products and business in India. For example, Defendants' statement that "product revenues decreased by $3.2 million, or 4%, in the first quarter of 2010 compared with the first quarter of 2009 due to the decrease in revenues from our EAGLE product line" (Def. Mem. at 31-32) was false and misleading because it falsely attributed the decline in revenue to the "timing of the completion of a number of large acceptance based projects in the first quarter of 2009" (¶84), rather

- 17 -

than the fact that EAGLE 5 was becoming obsolete with little market demand. Thus, Defendants created the false impression that decreased revenue for the EAGLE 5 products was exclusive to the first quarter of 2010. Similarly, on May 6, 2010, when Defendants partially revealed that orders had been impacted by the new Indian security regulations, they falsely stated that the impact was limited to the first quarter and that they expected those orders to be recorded "during the second quarter of 2010," even though Tekelec was well into the 2010 second quarter at the time the statement was made and no security clearance had been granted. ¶82. Thus, contrary to Defendants' assertions (*see* Def. Mem. at 31-32), these misleading statements cannot be considered cautionary. *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) ("incomplete disclosures, or half-truths, implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements"); *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 U.S. Dist. LEXIS 1862, at *39 (N.D. Ill. Feb. 7, 2003) (even though corporation acknowledged potentially bad economic consequences due to delays in testing of its new drug, statements were still actionable because the defendant "downplayed the significance of the . . . delay by not disclosing the serious extent and nature of the problems plaguing [the drug]"); *Kurtzman v. Compaq Computer Corp.*, No. H-99-779, 2000 U.S. Dist. LEXIS 22476, at *81 (S.D. Tex. Dec. 12, 2000) ("It is well settled that once a company makes a disclosure . . . the company is under a duty to speak the full truth.").

Finally, to the extent that any of the statements challenged in the Complaint are forward-looking, Plaintiffs have alleged sufficient facts demonstrating that Defendants made the statements with actual knowledge that they were false or misleading. Accordingly, the PSLRA provides no safe harbor protection to with respect to any of those statements. *See In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (alleging particularized facts that show Defendants had actual knowledge that the forward-looking statements were false when made would "blow the statements out of the safe harbor"). As discussed below, because Defendants knew of the problems the Company was experiencing with the sale of its EAGLE products and the delays the new security regulations in

- 18 -

India were causing for Tekelec, Defendants cannot seek cover under the PSLRA's safe harbor or the bespeaks caution doctrine. *See In re Conventry Healthcare Secs. Litig.*, No. 08:09-CV-2337-AW, 2011 U.S. Dist. LEXIS 33808, *34-*35 (D. Md. Mar. 30, 2011) (finding statement that defendants were "pleased to confirm that [their] businesses continue[d] to perform well [were] fundamentally sound" were materially misleading because defendants "allegedly had knowledge of the problems processing PFFS claims").

### 2. Defendants' Statements Are Not "Puffery"

Defendants' argument that some of their false and misleading statements are "nothing more than optimistic statements" or "puffery" (Def. Mem. at 33) also fails. At the time they were made, Defendants did not have a reasonable basis for their positive statements about Tekelec's business in India and the Company's EAGLE product line, which takes them out of the realm of "puffery." *See Dunn v. Borta*, 369 F.3d 421, 431 n.20 (4th Cir. 2004) ("[P]rojections and statements of optimism are false and misleading for purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made."); *see also Conventry Healthcare Secs. Litig.*, 2011 U.S. Dist. LEXIS 33808, at *35 (although a statement construed "as consisting of mere puffery or an inactionable statement of future performance . . . the fact that the Defendants allegedly had knowledge of the problems . . . would render the statement materially misleading"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) (holding that even "optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . . or that the opinions imply certainty").

For example, the Complaint alleges that Defendants had no reasonable basis for their positive representations about the Company's business in India – including statements that Tekelec was experiencing "growth in . . . markets such as India" (¶68); the Company's "success in India continues" (*id.*); and "the emerging markets remain strong. . . . In particular our position in India . . . remains strong" (¶69). At the same time that these statements were made, security regulations enacted in India

- 19 -

were causing significant problems for Tekelec's business in that country and delayed a material number of orders. ¶¶72, 77. In fact, no security clearance had been granted and no new orders from Indian customers had been booked by Tekelec. *Id.* Nevertheless, Defendants continued to make optimistic statements about the Company's business, stating that India is a "very good business for us, and we see that as a growth driver for our business going forward" (¶78), while failing to disclose adverse information that would have exposed Tekelec's difficulties in India and permitted investors to make an independent determination of whether Tekelec's business there was successful or would experience future growth. It is for this reason that Defendants' statements do not constitute harmless puffery. *See City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 356-57 (S.D.N.Y. 2006) ("While mere puffery is insufficient to state a claim of securities fraud, public statements must be consistent with reasonably available data and should not misrepresent existing facts."); *see also Lefkoe v. Clothiers*, No. WMN-06-1892, 2007 U.S. Dist. LEXIS 98777, at *21 (D. Md. Sept. 10, 2007) ("specific statements concerning forecasts of growth in earnings and sales, and confidence in inventory" were not mere puffery where the complaint alleged that defendants knew of contrary facts regarding inventory build-up and the resultant need to engage in steep discounting"); *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1113 (M.D. Fla. 2005) (statements that "publicly touted new operations as a continuing source of rapid growth with knowledge that these operations would not yield revenue increases for some time, if ever," were actionable).

Defendants also mischaracterize certain statements about Tekelec's EAGLE product line as puffery. *See* Def. Mem. at 33. For example, Defendants' statements that the "[EAGLE 5] business has been very strong" and "will continue to be a pretty standard and robust business" (¶80), as well as statements that although the EAGLE 5 was "not going to be a lot of growth," it was "going to pay a lot of bills" and there were "some very good margins coming out of that" (¶76), failed to disclose that the EAGLE 5 was not generating significant new orders or revenue and was quickly becoming obsolete. Similarly, Defendants' statements that Tekelec had "some very good traction" with its EAGLE XG

products and "expect our growth to come from those products" (¶76) neglected to inform investors that

EAGLE XG was not selling as well as management had hoped. Where, as here, statements regarding the

current or future success of a product failed to disclose, or masked, material concerns, courts have found

such statements to be actionable and not mere puffery. *See, e.g., In re Allaire Corp. Secs. Litig.*, 224 F.

Supp. 2d 319, 331-32 (D. Mass. 2002) (finding actionable a statement that a product was "fueling

growth"); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999)

(statements of "strong worldwide demand" for products were actionable because they failed to disclose

"materially misleading adverse business trends"); *In re Hi/fn, Inc. Sec. Litig.*, No. C 99-4531 SI, 2000

U.S. Dist. LEXIS 11631, at *18 (N.D. Cal. Aug. 9, 2000) (expressions of optimism and forecasts of

increased business and revenues were not mere puffery where defendants allegedly knew of imminent

reductions in orders).[9]

### 3. Defendants' Statements of Opinion Are Actionable

Similarly, Defendants' argument that some of the alleged false and misleading statements are not

actionable because they are statements of opinion, Def. Mem. at 34, is likewise wrong. Contrary to

Defendants' assertions, "[s]tatements of fact and statements of opinion can both be material." *Gasner v.*

*Board of Supervisors*, 103 F.3d 351, 363 (4th Cir. 1996). Courts distinguish statements of belief or

opinion concerning current or past facts that may be material from opinions on future events which are

---

[9] Citing to *Raab v. General Physics Corp*., 4 F.3d 286, 289 (4th Cir. 1993), Defendants argue that courts have upheld the puffery defense when evaluating statements analogous to the ones at issue here. *See* Def. Mem. at 33. Unlike the statements in *Raab*, however, here, Defendants' statements were not merely "vague statements predicting growth." *Id.* at 289. Rather, Defendants' statements concerning the purported fact that Tekelec was experiencing growth and success in its Indian market, as well as statements regarding the strength of Tekelec's EAGLE 5 product line, were statements of substance about the ***then-current*** performance of Tekelec's businesses. As emphasized in *Raab*, such "expressions of belief or opinion concerning *current* facts may be material." *Id.* at 290 (emphasis in original). Even Defendants' projections of future growth of its business are actionable, because, unlike the statements in *Raab*, Defendants' statements predicted growth while knowing that such growth was not possible. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements were actionable where "complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").

generally not material. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 371 n.22 (D. Md. 2004); *see also Raab*, 4 F.3d at 290 (noting that expressions of belief or opinion concerning current facts may be material"). Where, as here, a statement "is false, disbelieved by its maker, and related to matters of fact which can be verified by objective evidence," it is an actionable false factual statement. *In re Pozen Sec. Litig.*, 386 F. Supp. 2d 641, 646 (M.D.N.C. 2005) (citing *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. Va. 2004)).

Here, the challenged statements are all based on current, verifiable facts. *See, e.g.,* ¶68 ("number portability success in India ***continues***"); ¶69 ("I think the emerging markets ***remain strong***"); ¶68 ("[w]e ***are especially pleased with our growth*** in the emerging markets . . ."); and ¶73 ([w]e believe that our EAGLE 5 Product Family ***is successful*** . . ."). By using the present term verbs "continues," "remain," "are pleased" and "is successful," Defendants intended to convey the impression that Tekelec's Indian business and EAGLE products were, at that point, performing well – a matter that can be empirically determined.

Moreover, Plaintiffs have alleged with great particularity precisely why Defendants' alleged stated "opinions," lacked a reasonable basis when made and were undermined by facts Defendants knew or recklessly disregarded. For example, as discussed above, the Indian regulation, which required Tekelec to receive security clearance for equipment before a purchase order could be placed, caused numerous delays in booking orders for the Company. Indeed, at the time Defendants' statements were made, no security clearance had been granted and no new orders from Indian customers had been booked by Tekelec. Accordingly, it is hard to comprehend how Defendants could have claimed to be successful in obtaining Indian business. Similarly, Defendants were acutely aware that the EAGLE 5 product was "steadily losing business" throughout the Class Period (¶57) and, thus, had no reasonable basis for their

statement that the EAGLE 5 "is successful."[10]

### D. Plaintiffs Have Sufficiently Alleged a §10(b) Claim Against Defendant Rush

Defendants argue that Rush cannot be held liable for securities fraud under §10(b) because he is not alleged to have personally made any of the false or misleading statements at issue. *See* Def. Mem. at 35. Defendants are wrong.

As alleged in the Complaint, beginning in May 2006, Rush became Vice President, Corporate Controller and Chief Accounting Officer of Tekelec. ¶26. In March 2010, Rush began serving as interim Chief Financial Officer ("CFO") and became Senior Vice President and CFO in April 2010. *Id.* In his role as CFO, Rush had direct information regarding Tekelec's business in India, as well as the performance of the Company's EAGLE products, and was aware of, and contributed to Defendants' public statements. Rush also personally signed SEC filings that contained certain of the materially false and misleading statements alleged in the Complaint. In particular, Rush signed the 2009 Form 10-K on February 25, 2010, which is alleged to contain materially false and misleading statements. ¶¶73-74. He also signed the 1Q 2010 Form 10-Q dated May 6, 2010, which misleadingly attributed a decline in revenues from the EAGLE 5 to "timing" issues. ¶84. This alone is sufficient to hold Rush liable under §10(b). *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (agreeing that a corporate officer's "signature on the document" containing false statements is among the "specific factual allegations" sufficient to "link the individual to the statement at issue"); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (holding that an officer who signs an SEC filing makes a statement under section 10(b), even if the officer did not participate in the drafting of

---

[10] Defendants also try to neutralize the falsity of their Class Period statements by systematically plucking out certain portions of their statements, included in the Complaint for contextual purposes, and declaring these portions to be truthful. For example, Defendants point to the following two statements, which they contend are "accurate statements of historical fact" (Def. Mem. at 34): (1) "We . . . now have 97 operators in 33 countries" (¶68); and (2) "Year-over-year from '08-'09 we grew those products by 50%" (¶76). Neither of these statements, however, are alleged to be false and misleading in the Complaint.

the document); *In re Affiliated Computer Servs. Deriv. Litig.*, 540 F. Supp. 2d 695, 702 (N.D. Tex. 2007) ("The fact that these Defendants signed the allegedly false or fraudulent documents constitutes a 'specific factual allegation' that links these individuals to the statements at issue."); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1178, n.10 (C.D. Cal. 2007) (signatures on SEC filings "counts as statements under Section 10(b)"). As a result, Rush may be held liable for statements in the Form 10-K and Form 10-Q. *See Meckenstock,* 1998 U.S. Dist. LEXIS 21042, at *18 n.2 (refusing to dismiss 10(b) claim against an individual defendant that "signed the Form 8-K that contained misstatements and omissions of material fact").

Apart from his liability for false statements in Company documents he signed, Rush is also liable for knowingly failing to correct any false or misleading statements made by Defendants Plastina or Everett in his presence. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. Tex. 2005) ("a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements").[11] For example, Rush was present during an investor conference held on March 2, 2010, during which Defendant Plastina misleadingly stated that Tekelec's EAGLE XG had "good traction" and that the Company expected its "growth to come from those products," that it was "going to pay a lot of bills," and there were "some very good margins coming out of that." ¶76. Rush was also present during a March 9, 2010 investor conference where Defendant Everett falsely described Tekelec's EAGLE 5 and business in India as "very strong" and "very good" and stated that the EAGLE products "will continue to be a pretty standard and robust business for us." ¶¶78, 80. Because Rush was undisputedly present at the time Defendants Plastina and Everett made false and misleading statements to investors, and had the opportunity to correct them, but did not, he is liable for these statements as if they were his own. At the very least, Rush

---

[11] The Fifth Circuit found this holding did not conflict with the circuit's ban on group-pleading. *Id.* at 262-63.

is "at fault for a material omission in failing to correct such statements in that context." *Barrie*, 397 F.3d 249 at 262.

### E. The Complaint Alleges Specific Facts Giving Rise to a Strong Inference of Scienter

A securities fraud plaintiff may adequately allege scienter by pleading Defendants' recklessness. *See Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009) (citing *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 344 (4th Cir. 2003)). In the Fourth Circuit, a complaint satisfies the scienter pleading standard in the §10(b) context if it alleges acts "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* Plaintiffs have done so here.

Defendants' motion picks the Complaint's allegations apart and dissects each and every one of the allegations that support scienter in order to argue that each one, separately, does not raise a strong inference of scienter. However, according to the United States Supreme Court, "[t]he inquiry . . . is whether *all* of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). Defendants' argument fails because Defendants do not analyze Plaintiffs' allegations taken as a whole – which are "*at least* as compelling as any opposing inference one could draw from the facts alleged," *Tellabs*, 551 U.S. at 324 – but rather view each in isolation, directly contrary to established law.

Importantly, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre or even the most plausible of competing inferences," but it "must be more than merely 'reasonable' or 'permissible' . . . ." *Tellabs*, 551 U.S. at 324. In the Fourth Circuit, a "'flexible, case-specific analysis' guides the court in determining the sufficiency of a plaintiff's scienter allegations." *Pozen Sec. Litig.*, 386 F. Supp. 2d at 644.

1.      **Defendants Knew or Recklessly Disregarded the Fact that the EAGLE Product Line Was Performing Poorly**

Plaintiffs allege that the EAGLE 5 and EAGLE XG product lines were core, *i.e.*, important, products for Tekelec.  ¶¶27, 28.  EAGLE 5 was a legacy product, sales of which had reached its saturation point by the end of 2009, prior to the start of the Class Period.  ¶¶56-58.  In addition, by February 2010, the EAGLE 5 training team was anticipating being laid off because the product had no new customers who would need training on the product.  ¶56.  In addition, since its launch in 2008, EAGLE XG had missed its projected revenue, and it was clear from then that the product was not selling well.  ¶58.  Tekelec's revenue was directly tied to the backlog of orders it had already booked.  ¶¶29-30.  Thus, Defendants were acutely aware of their revenue expectations based upon the backlog of orders the Company had.

The Complaint further alleges that, throughout the Class Period, the Company had weekly revenue meetings, as well as in daily meetings in the weeks leading up to the quarter's end, during which all pending orders were reviewed, and which the Defendants were specifically briefed on.  ¶¶60-62.  Because the Individual Defendants were the ones responsible for revenue projections for the Company, the only reasonable inference is that they were acutely aware of the results and discussions during these revenue meetings.  ¶63.  Defendants also had access to the information presented at weekly product meetings where financial information was discussed, including what was in the pipeline and future delivery dates.  ¶¶65-66.[12]  In short, revenue was being "reviewed constantly" by Defendants and those who reported to them.  ¶66.

---

[12]  Defendants argue that there is some inconsistency between the statement by CW 5 that defendants were briefed on the weekly revenue meetings, and CW 4's statement that defendants were briefed on the product meetings at the weekly Friday revenue meetings.  Def. Mem. at 16.  Defendants are wrong.  CWs 5 and 6 never stated that the Individual Defendants never attended the meetings, and such a statement is nowhere in the Complaint.  In addition, since those who attended the meetings briefed Defendants, it is irrelevant whether Defendants were actually at the meetings or not – they clearly had access to the information presented at the meetings, including the information regarding the poorly performing EAGLE 5 and EAGLE XG core products.

As a result of these details, defendants, while touting the "success" of EAGLE 5 (¶¶73, 76, 80) and the "growth product" EAGLE XG (¶¶76, 80), were aware that EAGLE 5 and EAGLE XG were not performing according to expectations, and were far from performing as well as Defendants were stating they were to the market. Thus, Defendants were aware that their Class Period statements regarding EAGLE 5 and EAGLE XG were false when made.

Defendants argue that the fact that a specific product line or particular market is essential to the financial results of the Company, *i.e.*, a "core operation," cannot support scienter. To the contrary, "the fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the company and its relevant officers knew of easily discoverable additional facts that directly affected that source of income." *In re Peoplesoft, Inc.*, No. C 99-00472 WHA, 2000 U.S. Dist. LEXIS 10953, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000); followed by *In re Conventry Healthcare Sec. Litig.*, 2011 U.S. Dist. LEXIS 97246, *10-*12.

### 2. Defendants Knew or Recklessly Disregarded that New Security Regulations in India Were Negatively Impacting Tekelec's Business

Defendants argue that Plaintiffs' allegations that demonstrate Defendants' knowledge of the delays in India and the impact of the security clearance regulations based on Professor Khanna's expert opinion cannot support a strong inference of scienter. Defendants are wrong. *See Arlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 483 (E.D. Va. 2002) (relying in part on the experts cited in the complaint to find a strong inference of scienter); *Nursing Home Pension Fund, Local 144 v. Oracle*, 380 F.3d 1226, 1233-34 (9th Cir. 2004) (same); *In re Washington Mutual, Inc., Sec. Litig.*, No. 08-md-1919, 2009 U.S. Dist. LEXIS 99727, at *24 (W.D. Wash. Oct. 27, 2009). Indeed, in *Washington Mutual*, the district court similarly relied on expert testimony to buttress allegations that Washington Mutual Bank's ("WMB") "appraisal process was corrupt" and that the company had a much higher loan to income ration than its peers which "confirms that the deterioration in the underwriting standards in WMB was

- 27 -

nationwide in scope." *Id*. at *27.[13]

Defendants also attempt to muddy the waters by making issues where none exist. For instance, Defendants argue that the Complaint mischaracterizes the Indian regulations and that the allegation that security clearance might be received within 30 days is incorrect because the actual letter states that if no response is received it is presumed there is no objection. Def. Mem. at 19. There is no inconsistency. The content of the letter implies that if there *is* a response, the clearance will be longer than 30 days. Thus, clearance *might* come within 30 days, as stated in the Complaint, or you may receive a response which will require more information prior to any clearance given. Clearly Tekelec *must have* received responses indicating its security clearance was further delayed because, as of the date of the Complaint, *Tekelec had received no security clearance at all*. ¶98. Thus, Defendants' "evidence" only further supports the strong inference that Defendants were well aware that any revenue they were expecting from India was unreasonable and would be delayed far past the 30 days noted in the letter.[14]

Finally, Defendants argue that their May 2010 disclosure regarding delays in India undermines scienter. Def. Mem. at 21. This is also meritless. Unless Defendants had sought their first security clearance within 30 days of their May 6, 2010 disclosure, they did not "timely" disclose the delays the Company was experiencing in India. As discussed above, had they received *no response* from the Indian

---

[13] The cases cited by Defendants do not hold otherwise. *See* Def. Mem. at 17. In those cases, the expert opinions were contained in affidavits attached to the complaint, and were not in the actual pleading. In addition, in *In re Silicon Storage Tech, Inc. Sec. Litig.*, No. 05-2595, 2007 U.S. Dist. LEXIS 21953, at *31 (N.D. Cal. Mar. 9, 2007), the court disallowed expert testimony which took the form of generic market data. None of Defendants' cases stands for the proposition that Defendants posit, *i.e.*, that allegations in a complaint may not contain expert testimony. Moreover, the Complaint sufficiently states Professor Khanna's basic credentials as an expert and the basis of his assessment. Nothing more is required. *See Nursing Home Pensioni Fund, Local 144*, 380 F.3d at 1233.

[14] Similarly, Defendants argue that the January 2010 letter states nothing about delays. Def. Mem. at 20. Not true. The Indian Government explains that many service providers are failing to provide certain details, then goes on to state that this information must be included "to avoid unnecessary delay." Volz Dec. Ex. D. Thus, because many providers did not previously include the information, the reasonable inference is that their clearance had been delayed. Defendants' arguments are baseless and do not detract from the strong inference of scienter pled in the Complaint.

- 28 -

government regarding their security clearance requests, they would have assumed the clearances would have been granted within 30 days. Then, the orders would have been booked and the revenue could have been recognized. However, because they received ***no clearance at all during the Class Period***, that only means that Tekelec must have received at least one, if not more, letters regarding delays in their requests for security clearance. Defendants cannot just have inferences taken their way. Rather, the only cogent or compelling inference that can be drawn from the fact that the Company received no security clearances in India during the entire year of 2010 is that they received responses from the Indian government notifying them of delays or corrections needed to be made before clearance would be given.[15] As such, Defendants' belated May 2010 disclosure does nothing to undermine the strong inference of scienter pled in the Complaint.

### 3. The Complaint Properly Relies on the Statements of Confidential Witnesses

Defendants spend a large portion of their brief attacking the statements of the confidential witnesses ("CWs"). This is not surprising given the level of detail and corroboration the witnesses provide. No matter how many times Defendants complain about what the witnesses did *not* say, however, their arguments cannot detract from the fact that what the witnesses ***do*** say demonstrates, along with the other scienter allegations, that it is at least as likely that Defendants knew the truth about the Company's financial position as their contention that they did not know. This is all Plaintiffs are required to plead at this stage. *See Tellabs*, 551 U.S. at 328 ("We emphasize, as well, that under our construction of the 'strong inference' standard, a plaintiff is not forced to plead more than she would be required to prove at trial"). Defendants' arguments would require Plaintiffs to allege ***every*** fact surrounding the issues during the Class Period, and essentially surpass a motion for summary judgment, at this motion to dismiss stage. Although the PSLRA did enhance the scienter standard, Congress did not

---

[15] Because of these strong and compelling inferences, Defendants' arguments based upon "fraud by hindsight" are completely meritless. Def. Mem. at 22.

intend that Plaintiffs should allege and prove each and every fact supporting their case at the motion to dismiss stage, prior to discovery. Rather, "[w]hen making the assessment whether scienter has been adequately pleaded, it is prudent to keep in mind that the PSLRA does not require a plaintiff to prove his case in his complaint." *Arnlund,* 199 F. Supp. 2d at 476. "It must be remembered that a plaintiff generally must frame the facts respecting [scienter] without the benefit of discovery, and therefore, most often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." *Id*; *see also Lefkoe*, 2007 U.S. Dist. LEXIS 98777 (same). Plaintiffs have met the standard here and should be entitled to have their case proceed to discovery to test and prove their case.

Moreover, when assessing confidential witness statements to determine scienter, the Court should consider the witnesses' statements together "as a whole." *Conventry Healthcare*, 2011 U.S. Dist. LEXIS 97246, at *14-*15. The court should "consider the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading." *Id*. In *Conventry*, the Court determined that although the allegations of seven confidential witnesses alone were not sufficient to impute scienter to the company as a whole, their knowledge, combined with their positions, "gave rise" to defendants' knowledge, and corroborated another witness's statements. *Id*. at *15.

Here, each of the confidential witnesses' statements corroborate one another, and provide an inference of Defendants' scienter that is at least as likely as Defendants' contention that they did not know about the failing EAGLE 5 and EAGLE XG products. *See Tellabs*, 551 U.S. at 324 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the 'most plausible of competing inferences'").

For instance, CWs 1-4 each corroborate one another regarding the failing EAGLE 5 product by at least the start of the Class Period. ¶¶56-58. In addition, CWs 4-7 each corroborate one another on the

meetings which took place regarding revenue and products in order that Defendants could make their revenue predictions. ¶¶59-66. The Complaint also details when each witness was employed by Tekelec, what their positions were and what the witnesses learned while in their positions at the Company. ¶¶56-65. The Fourth Circuit and the PSLRA require nothing more for the Court to consider the detailed facts provided by these witnesses.[16]

### 4. Defendants' Stock Sales Further Support a Strong Inference of Scienter[17]

It is well-settled in the Fourth Circuit that "[s]ales of stock by corporate insiders can suffice to establish scienter if the trades were unusual in their timing and amount." *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005); *see also MicroStrategy*, 115 F. Supp. 2d at 643; *In re Orbital Sciences Corp. Sec. Litig.*, 58 F. Supp. 2d 682 (E.D. Va. 1999); *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 476 (M.D.N.C. 2004) ("Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter"); *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994) (insider sales of just $760,599 raise an inference of scienter). Courts have found insider sales to be unusual based on a number of factors, including the amount of profit from sales, *In re Oxford Health Plans, Inc.* 187 F.R.D. 133, 140 (S.D.N.Y. 1999); the percentage of stock sold, *Stevelman*

---

[16] Citing a single case, Defendants contend that some courts have discounted confidential witnesses after *Tellabs*. Def. Mem. at 9, n.8. This argument, as seen in the case cited by Defendants, stems from the Seventh Circuit's opinion in *Higginbotham v. Baxter Int'l.*, 495 F.3d 753, 757-58 (7th Cir. 2007). However, the Seventh Circuit subsequently decided *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008) (*Tellabs II*), after the Supreme Court directed the Court of Appeals to revisit its ruling reversing in part the district court's dismissal of the case in light of the clarified pleading standard for scienter. In *Tellabs II*, the Seventh Circuit considered allegations in the complaint based on many confidential sources and concluded that scienter was adequately pled. In so doing, it limited its holding in *Higginbotham*, noting that the two cases were factually dissimilar. The *Tellabs II* Court emphasized that the confidential sources were numerous, were adequately described, and based on the descriptions, would have been in a position to know the information alleged. *Tellabs II*, 513 F.3d at 712. Moreover, multiple confidential sources corroborated much of the information. *Id*. Accordingly, the Court concluded that, "the absence of proper names does not invalidate the drawing of a strong inference from [the confidential witnesses]' assertions." *Id*. Likewise, here, the corroboration from multiple witnesses, in addition to the detail about their positions and meetings they attended, supports the finding of a strong inference of scienter.

[17] Defendants mischaracterize the Complaint, suggesting that Plaintiffs' allegations of stock sales are the primary indicia of scienter, when, in fact, they are pleaded as only one of several factors demonstrating scienter.

*v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999); the change in volume of insider sales, *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 296 (S.D.N.Y. 1999); and the number of insiders selling. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2 Cir.), *cert. denied sub nom. Scholastic Corp. v. Truncellito*, 534 U.S. 1071 (2001). Because each set of circumstances is unique, even a modest profit sale by a single insider may be adequate to establish scienter. *See MicroStrategy*, 115 F. Supp. 2d at 644 (sales in the aggregate amounted to less than 5% of all of the individual defendants' total holdings, but were still probative of scienter).

Here, during the short 6-month Class Period, defendants sold 231,949 shares of Tekelec stock, reaping proceeds of over $3.7 million. ¶104.[18] Defendants' trading was suspicious in amount: Defendant Rush, in the 6-month period preceding the Class, sold stock on only one date, 3,377 shares for proceeds of $53,694. ¶105. By contrast, during the 6-month Class Period, Rush sold more than three times the number of shares (11,174 shares for proceeds of $191,913.03) or nearly *four times* the proceeds of his pre-Class Period sales. Significantly, these sales represented *100%* of defendant Rush's ownership in Tekelec stock. ¶105. Defendant Everett did not sell any stock in the 6 months prior to the Class Period. During the Class Period, however, he sold 24,000 shares for proceeds of $398,808.00. ¶106. Lastly, Defendant Plastina sold 113,703 shares in the 6 months preceding the Class Period on three separate dates for proceeds of $1,737,869.12. During the Class Period, he sold, on four separate dates, 196,775 shares for proceeds exceeding $3.1 million – nearly double his proceeds from his prior trading.

---

[18] Defendants argue that Plaintiffs should not have limited their comparison to only the 6 months preceding the Class Period. Def. Mem. at 7. They have not, however, explained why there would be a better comparison than the exact amount of time prior to the Class Period. The Class Period is 6 months long, and the comparison is to the 6 months preceding the Class Period. There is no reason to compare the trading history of Defendants to any different time period. Moreover, Defendants' reliance on *Ronconi v. Larkin*, 253 F.3d 423, 435-36 (9th Cir. 2001), is misplaced because, unlike here, the seventh months of trading history provided there to establish a pattern of defendants' trading did not "prove much about their trading habits, since they were not able to trade during some or much of that time" since the company was engaged in non-public merger discussions and the officers could not have traded, knowing of the non-public merger discussions, during that time without violating 15 U.S.C. §78(j)(b). *Id.*

*See Copansky v. Thompson* (*In re Orbital Sciences Corp. Secs. Litig.*), 58 F. Supp. 2d 682, 686 (E.D. Va. 1999) (finding that defendants' sales of 15% and 72% of their respective shares in the company raised a strong inference of scienter). As the Court noted in *Copansky*, the fact that during the class period defendants netted more than twice their pre-Class Period proceeds supported a strong inference of scienter. *Id.* Here too, defendants' trading was suspicious in amount.

Defendants' trading was also suspicious in timing. Each of the Individual Defendants sold stock shortly after making misleading statements and while the stock was inflated. ¶¶105-107. *See Lefkoe*, 2007 U.S. Dist. LEXIS 98777 at *22-*25 (scienter adequately alleged where allegations were based upon knowledge from reports used for forecasting to which defendants had access and the basis of only a single defendant's stock sales of 74%). Here, Defendants not only had access to reports used for forecasting, and sold stock in suspicious amounts and timing, but one defendant sold 100% of all of his stock at two separate times during the Class Period. ¶105. The fact that Defendants in this case chose to sell their shares in large amounts and at unusual times, "is arguably too coincidental to be believed and thereby creates the strong inference of scienter that the PSLRA requires." *Copansky*, 58 F. Supp. 2d at 687. Thus, Defendants' insider stock sales, if not alone, then when considered with the totality of the allegations, raise a strong inference of scienter.

Defendants also argue that their stock sales cannot support a strong inference of scienter because they were made pursuant to a 10b5-1 stock sale plan. A 10b5-1 stock plan, however, is not relevant at the motion to dismiss stage because the existence of a stock plan is an "affirmative defense," which requires evidence of the plan itself, such as the date the plan was entered into and whether the "trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans." *Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 92 (1st Cir. 2009); *In re ArthroCare Corp. Secs. Litig.*, 726 F. Supp. 2d 696, 722-723 (W.D. Tex. 2010); *Lefkoe*, 2007 U.S. Dist. LEXIS 98777, at *25 n.11 ("Raising the affirmative defense of trading under a 10b5-1 trading, however, is 'typically premature . . . in a motion to dismiss'"); *Malin v. XL Cap.*

- 33 -

*Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007) ("the existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200-201 (S.D.N.Y. 2010) (same); *Orbital Sciences*, 58 F. Supp. 2d at 687 ("defendants might eventually be able to provide an explanation for [their] trading activity . . . But at this stage of the case and for the purposes of a motion to dismiss, the unusual insider trading alleged in Plaintiffs' Complaint suffices to create a strong inference of scienter").

In addition, there is some evidence on the Forms 4 submitted by Defendants that at least some of the trading plans were entered into ***during the Class Period*** when Defendants were aware of non-public negative information, which negates any inference of innocence. *See SEC v. Mozilo*, No. CV 09-3994-JFW (MANx), 2010 U.S. Dist. LEXIS 98203, at *65 (S.D. Cal. Sept. 16, 2010) (stating that "the SEC has raised genuine issues of material fact that Mozilo was aware of material, non-public information at the time he adopted or amended these trading plans and that he acted with scienter"); *Freudenberg*, 712 F. Supp. 2d 171 at 200 (noting that "here it is alleged that Defendants were already aware of the Company's mortgage exposure time bombs at the time Simmons and Webb adopted their trading plans"); *In re NutriSystem, Inc. Secs. Litig.*, 653 F. Supp. 2d 563, 576 (E.D. Pa. 2009) (noting that a 10b5-1 plan may infer innocence if "***the plan is adopted in writing prior to becoming aware of material non-public information***"); *Garden City Employees' Ret. Sys. v. Psychiatric Sol.*, No. 3:09-00882, 2011 U.S. Dist. LEXIS 35661, at *87-*89 (M.D. Tenn. March 31, 2011) (finding 10b5-1 plans did not negate scienter). Moreover, comparing Defendants' trading in the 6-month period preceding the Class Period to the 6-month Class Period demonstrates a substantial change, leading to the inference that Defendants amended their plans to allow them to sell more stock. Consequently, Defendants' stock plans here do not infer innocence, nor do they negate the strong inference of scienter which the stock sales support.

Finally, Defendants' argument that they did not sell their stock at the precise time when Tekelec stock traded at its peak during the Class Period, Def. Mem. at 6, is meritless. Indeed, the authority that they cite to for this argument, *Teachers' Ret. Sys. v. Hunter,* 477 F.3d 162, 184-185 (4th Cir. 2007), dealt

- 34 -

with the specific instance of where 75% of a defendant's trades were when the stock was trading below $30 per share and the stock had climbed as high as $198 during the class period (a difference of **$158** per share). By contrast, the insider sales here were made between $14.8083 per share and $18.20 per share, ¶104, while the stock price never exceeded $19.89 during the Class Period (a maximum difference of $5 per share). Moreover, Defendants are arguing that unless a defendant sells his shares on the precise day that the stock price was at its highest, insider trades cannot contribute to a strong inference of scienter. Although Defendants did not sell at the highest price, because they could not have known that the price would actually go higher after they sold, they did sell at prices and at times when Tekelec stock was artificially inflated due to their misstatements and well above the price to which the stock fell once the truth was made known to the market. ¶¶105-107. Consequently, Defendants' sales, viewed in totality with the rest of Plaintiffs' allegations, raise a strong inference of scienter.

     **5.     Defendants' Positions Within the Company, Accompanied by Their Receipt of Internal Reports and Attendance at Meetings, Further Evidence Their Scienter**

The Individual Defendants were senior executives of Tekelec who were closely involved with and had direct responsibility for revenue reporting and forecasting for important issues affecting the Company's business, including EAGLE 5 and EAGLE XG, and regulations affecting a major market like India. Where a defendant "was integrally involved in running [the Company] and evaluating the financial condition of the company," scienter is sufficiently alleged. *Zuckerman v. Smart Choice Automotive Group, Inc.*, No. 99 CV 237 ORL 99A, 2000 U.S. Dist.LEXIS 13489, at *5-*6 (M.D. Fla. May 18, 2000); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) ("that [the CEO and president] was the most senior executive of the Company is a fact relevant in our weighing of the totality of the [scienter] allegations"). Moreover, a strong inference of scienter exists where corporate insiders would know of adverse facts affecting an important segment of their business. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *see also Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, No. 00-4285, 2002 WL 33934282, at *19 (D.N.J. June 26, 2002) ("a defendant's position in the Company may

- 35 -

be considered in conjunction with other factors to establish actual knowledge"), *aff'd*, 394 F.3d 126 (3d Cir. 2004). Defendants may not simply disavow knowledge of fraudulent practices, because "facts critical to a business's core operations . . . generally are so apparent that their knowledge may be attributed to the company and its key officers." *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E. D. Wash. 1998); *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) ("facts critical to . . . an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers'"); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (officers of a company can be assumed to know facts "critical to a business's core operations or to an important transaction that would affect a company's performance").

There is no denying that top executives are well aware of material facts concerning a company's earnings. *See In re ValuJet Inc. Sec. Litig.*, 984 F. Supp. 1472, 1479-80 (N.D. Ga. 1997). In recognition of this fact, courts routinely impute to officers knowledge about adverse developments affecting their company's core business. *See, e.g., Cosmas*, 886 F.2d at 12-13 (insiders rightfully imputed with knowledge of elimination of "potentially significant source of income for the company"). Here Defendants' misrepresentations undoubtedly concern core business operations of the Company. This can hardly be disputed, as the Company announced disappointing earnings due to the reduction in orders for EAGLE 5 and delays due to regulations in India. ¶¶88, 90

In addition, the Complaint not only contains allegations regarding the Individual Defendants' scienter as a result of their executive positions and access to internal information, but goes further and specifically details meetings and the types of reports Defendants received. ¶¶56-66. *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) ("scienter allegations based on, *inter alia*, the fact that defendants "had access to periodic reports" to track information on practices challenged in the complaint); *In re Meta Fin. Group, Inc.*, No. 09 Civ. 6185, 2011 U.S. Dist. LEXIS 77811, at *27 (N.D. Iowa July 18, 2011) ("the combination of the allegations of the individual defendants' positions with [the Company], their alleged access to information and the

- 36 -

disclosures in question, and the nature of the alleged misrepresentations and omissions give rise, at the

very least, to a 'strong inference'" of scienter).  Consequently, Defendants' executive positions and their

access to internal corporate information give rise to a strong inference that they acted with the requisite

scienter.[19]

**F.     The Complaint Adequately Alleges Control Person Liability Under Section 20(a) of the Exchange Act**

The Individual Defendants are also liable as control persons of Tekelec under §20(a) of the

Exchange Act.  To establish a §20(a) violation, Plaintiffs must allege: (1) a primary violation of §10(b)

of the Exchange Act; and (2) that the defendant had "control" over the primary violator.  *See Huttenstine,*

2006 U.S. Dist. LEXIS 93844, at *18-*19.  Defendants' sole opposition to Plaintiffs' §20(a) claims is

based on their erroneous proposition that Plaintiffs have not pleaded a predicate §10(b) violation.  As

demonstrated throughout this memorandum, Plaintiffs have alleged a viable underlying §10(b) claim and,

as such, Plaintiffs' §20(a) claims are meritorious.  *See Lefkoe,* 2007 U.S. Dist. LEXIS 98777, at *27 n.12.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion

to dismiss in its entirety.[20]

---

[19]  Defendant Plastina resigned as CEO effective January 4, 2011, as a result of the Company's problems in 2010.  This, in addition to Plaintiffs' scienter allegations, is further support for a strong inference of scienter. *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) ("[A]lthough not sufficient in and of themselves, [resignations] add to the overall pleading of circumstantial evidence of fraud.").

[20]  Although Plaintiffs believe that they have more than adequately stated claims against Defendants, in the event the Court determines the Complaint is deficient in any respect, Plaintiffs respectfully request an opportunity to seek leave to replead in accordance with Fed. R. Civ. P. 15(a) (noting that leave to amend "shall be freely given when justice so requires").  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) ("[L]eave to amend a pleading should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.") (emphasis in original).

- 37 -

DATED: October 31, 2011

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LABATON SUCHAROW LLP
CHRISTOPHER J. KELLER
JONATHAN GARDNER
PAUL SCARLATO
MINDY S. DOLGOFF
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

*Co-Lead Counsel for Plaintiffs*

SULLIVAN, WARD, ASHER & PATTON, P.C.
MICHAEL J. ASHER
25800 Northwestern Highway
1000 Maccabees Center
Southfield, MI  48075-1000
Telephone:  248/746-0700
248/746-2760 (fax)

*Additional Counsel for Plaintiff*

McDANIEL & ANDERSON, L.L.P
L. BRUCE McDANIEL
Lafayette Square
4942 Windy Hill Drive
Raleigh, NC  27609
Telephone:  919/872-3000
919/790-9273 (fax)

*Liaison Counsel*

- 38 -

CERTIFICATE OF SERVICE

I certify that on October 31, 2011, I caused a copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss The Amended Class Action Complaint to be served by CM/ECF upon the following counsel of record:

Richard L. Farley
Katten Muchin Rosenman LLP
550 South Tryon Street, Suite 2900
Charlotte, North Carolina 28202-4213
richard.farley@kattenlaw.com
Telephone No. (704) 444-2037
Facsimile: (704) 344-3075

*Attorney for the Defendants Tekelec,*
*Franco Plastina, William Everett, and*
*Gregory Rush*

/s/ David A. Rosenfeld
David A. Rosenfeld
N.Y. State Bar No. 3006871
Drosenfeld@rgrdlaw.com

LOCAL COUNSEL:
L. Bruce McDaniel
McDaniel & Anderson, L.L.P.
P.O. Box 58186
Raleigh, NC 27658
Tel: (919) 790-9273
Facsimile: (919) 790-9273
mcdas@mcdas.com