IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-4-D

PIPEFITTERS LOCAL NO. 636          )
DEFINED BENEFIT PLAN, and          )
NORFOLK COUNTY RETIREMENT          )
SYSTEM,                            )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )        **ORDER**
                                   )
TEKELEC, FRANCO PLASTINA,          )
WILLIAM H. EVERETT, and            )
GREGORY RUSH,                      )
                                   )
                Defendants.        )

On January 6, 2011, plaintiffs filed a securities class action suit against Tekelec and three

Tekelec executives regarding Tekelec's business in India and the continued commercial viability of

certain Tekelec products. On March 26, 2012, the court dismissed plaintiffs' amended complaint

based on improper group pleading [D.E. 31]. On May 4, 2012, plaintiffs filed a corrected second

amended complaint ("SAC") [D.E. 36]. Defendants moved to dismiss plaintiffs' SAC [D.E. 40]

and filed supporting materials [D.E. 41–42]. See Fed. R. Civ. P. 8(a), 9(b), 12(b)(6). Plaintiffs

responded in opposition to the motion to dismiss [D.E. 45–46], and defendants replied [D.E. 52].

As explained below, the court grants the motion to dismiss.

I.

Plaintiffs allege the following facts in the SAC. Tekelec was a publicly traded

telecommunications corporation that provided products "for wireless and landline [telephone]

service providers," including "systems and software that support signaling networks." SAC ¶¶ 2–3,

23.[1] Franco Plastina ("Plastina") served as Tekelec's president and chief executive officer ("CEO")

---

[1] On January 27, 2012, Siris Capital Group LLC acquired Tekelec, and Tekelec is no longer
a publicly traded company. See SAC ¶ 23.

from February 2006 to January 2011, when he resigned. Id. ¶ 24. William Everett ("Everett") was Tekelec's chief financial officer ("CFO") from April 2005 to March 2010, as well as executive vice president from February 2007 to March 2010. Id. ¶ 25. Everett retired in March 2010. Id. Gregory Rush ("Rush") was Tekelec's corporate comptroller and chief accounting officer from May 2006 until March 2010, when he became interim CFO. Id. ¶ 26. In April 2010, he became Tekelec's CFO and senior vice president. Id.

Plaintiffs allege that during the proposed class period from February 11, 2010, to August 5, 2010, defendants made materially false or misleading statements "regarding the true state of [Tekelec's] business in India, as well as the state of business for Tekelec's primary signaling products, the EAGLE 5 and EAGLE XG." Id. ¶ 4; see also id. ¶¶ 1, 7–13. Plaintiffs allege that despite positive public statements, defendants knew that Indian regulatory delays would negatively impact Tekelec's revenue and that the declining sales of EAGLE 5 were not balanced by increasing sales of EAGLE XG. See id. ¶¶ 5–6.

By 2009, international markets represented 61 percent of Tekelec's total revenue. Id. ¶ 3. Tekelec has done business in India since 2004, and India remained among Tekelec's most robust foreign markets. See, e.g., id. ¶¶ 3, 33–34, 36, 65. In 2009, the Indian government mandated new telecommunications technology standards for number portability. Id. ¶ 33. To comply with the mandate, Indian telecom companies needed to purchase products from companies like Tekelec. Id. Indeed, Tekelec successfully bid on a number of contracts. See id. (alleging that on a February 11, 2010 investor call, Tekelec representatives said that Tekelec won eight of ten bids); see also [D.E. 42-10] 4.

On December 3, 2009, the Indian Department of Telecommunications ("IDOT") issued a national security directive that foreign-licensed cellular technology, such as that provided by Tekelec, needed to receive a government clearance before an Indian telecom company could place an order. See SAC ¶ 35; [D.E. 42-4]. The December 2009 directive indicated that IDOT might grant

2

security clearances within 30 days. See SAC ¶ 36. On January 13, 2010, IDOT changed the regulations and clarified the information to be submitted on the application. Id. ¶ 37; [D.E. 42-5]. On February 25, 2010, IDOT further refined the application process and required more specific information with the applications. SAC ¶ 38. By this time, no security clearances had been issued. Id.

On March 3, 2010, IDOT issued a new directive, clarifying which equipment required a clearance. Id. ¶ 39. On March 18, 2010, IDOT again issued new guidelines concerning security clearances. Id. ¶ 40; [D.E. 42-6]. The March 18 directive still indicated that a security clearance could be granted as soon as 30 days after submitting the application. SAC ¶ 40. On August 3, 2010, a story ran in USA Today, entitled "Tough Indian Telecom Rules Spark Foreign Backlash," which described delays in the security-clearance process. Id. ¶ 44; [D.E. 42-7].

Plaintiffs allege that under Tekelec's revenue-recognition principles, these regulatory matters impacted earnings on existing contracts. When Tekelec entered a contract with a customer, the order was booked and added to Tekelec's order backlog. See SAC ¶ 29. Tekelec did not recognize revenue from an order until Tekelec delivered the order to the customer and, depending on the contract terms, the customer verified satisfaction with the product. See id. ¶¶ 30–31.

Plaintiffs allege that throughout the proposed class period of February 11, 2010, to August 5, 2010, defendants made numerous misrepresentations and omissions about the effect of the Indian security regulations on Tekelec's order flow and revenue.[2] During a February 11, 2010 conference call with securities analysts, Plastina expressed satisfaction with Tekelec's "growth in the emerging markets such as India and Brazil and the innovative insights that we gain from emerging market

---

[2] For all the allegedly fraudulent statements, defendants assert that plaintiffs did not "allege the specific parts of these statements they believe are false and misleading, they simply block-quote paragraphs." Defs.' Mem. Supp. Mot. Dismiss [D.E. 41] 29. However, the SAC makes clear that plaintiffs' allegations center on the bolded and italicized portions of those paragraphs. See Pls.' Mem. Opp'n Mot. Dismiss [D.E. 45] 9 (stating that "the statements Plaintiffs allege are actionable in the SAC are emphasized in bold and italicized text").

service providers." Id. ¶ 86. Plastina stated that Tekelec's "number portability success in India continues," id., and that Tekelec's "position in India and Brazil remains strong." Id. ¶ 87. When Tekelec filed its Form 10-K for 2009 on February 25, 2010, it did not mention the Indian security regulations. Id. ¶ 98.

On March 9, 2010, at an investor conference, Everett commented that India is "very good business for us, and we see that as a growth driver for our business going forward." Id. ¶ 101. Plaintiffs argue that this statement misrepresented the "significant havoc" that the security regulations were causing Tekelec's Indian business. Id. ¶ 102.

On May 6, 2010, Tekelec filed its Form 10-Q for the first quarter of 2010 ("2010 first quarter 10-Q"), issued an accompanying press release, and held a conference call. The press release stated:

> Orders in the first quarter of 2010 were adversely impacted in part by new regulations in India, which require equipment suppliers receive a security clearance from the Indian government prior to receiving purchase orders from telecommunications carriers. These new regulations resulted in the delay of approximately $10 million of orders. We expect to receive these orders during the second quarter of 2010.

Id. ¶ 105. During that day's conference call, Plastina substantially repeated the statement in the press release when discussing the Indian market. Id. ¶ 111. Later, in response to an analyst's question, Plastina said that "India, then has the security issues that really delayed things by about 90 days in the first quarter. There is a double whammy in India." Id. ¶ 112. Plaintiffs contend that these statements were false because Tekelec did not expect to receive the Indian orders in the second quarter of 2010 and misleading because they attributed revenue decline only to a temporary delay. See id. ¶¶ 105, 114.

One of Tekelec's most profitable product lines in India and elsewhere was the EAGLE 5 family of signaling software and systems. See, e.g., id. ¶¶ 28, 63. EAGLE 5 had been on the market since 2001. Id. ¶ 28. EAGLE XG, which launched in 2008, was intended to replace EAGLE 5 and "to keep pace with customers' evolving needs." Id. In 2009, customer demand for training on

4

EAGLE 5 declined. See id. ¶ 68. As a result, Tekelec shifted more resources towards EAGLE XG. See id.

Plaintiffs allege that throughout the proposed class period of February 11, 2010, to August 5, 2010, defendants made numerous misrepresentations and omissions that deprived the market of accurate information about the state of the EAGLE 5 and EAGLE XG product lines. The alleged misrepresentations began on February 11, 2010, when Tekelec issued a press release stating that

> [w]hile there remains uncertainty in current economic conditions, based on improved visibility compared to last year, we are providing full year guidance for 2010. We believe that full year revenues will range between $470 and $480 million . . . . In addition, we expect our book to bill ratio to be approximately one to one for the year.

Id. ¶ 85. During a conference call the same day, Everett reiterated that full-year revenue guidance and expected book-to-bill ratio. Id. ¶ 86. Based on the press release and conference call, analysts at two investment firms published research reports. Id. ¶ 88. Plaintiffs argue that these statements (and the reports) did not accurately reflect Tekelec's true financial state because revenues from EAGLE 5 were declining faster than revenues from EAGLE XG were growing. Id. ¶ 90.

On February 25, 2010, Tekelec filed with the SEC its Form 10-K for 2009, which Plastina, Everett, and Rush signed. Id. ¶ 93. In the 2009 Form 10-K, Tekelec stated that "our EAGLE 5 Product Family is successful because of our focus on the development of a competitive, highly scalable system that is able to meet the rigorous technological demands of rapidly growing global service providers and their networks." Id. Tekelec recognized "a year over year decline in new orders" based on "the difficult economic environment during 2009" but also noted increased demand from North American customers. Id. ¶ 94. Again, plaintiffs argue that these statements did not reflect Tekelec's true financial state because EAGLE 5 orders were declining for reasons beyond the general economic downturn. Id. ¶ 96.

At an investor conference on March 2, 2010, Plastina discussed Tekelec's EAGLE products. He stated that Tekelec had "some very good traction with what we call our growth products," which

5

Plastina said included EAGLE XG and two other non-EAGLE products. Id. ¶ 99. As to EAGLE 5, Plastina added that "[i]t's not going to be a lot of growth but it's going to pay a lot of bills, some very good margins coming out of that." Id. ¶ 99. Plaintiffs argue that Plastina's comments did not reflect the truth about EAGLE XG's growth or EAGLE 5's decline. Id. ¶ 100. A week later, on March 9, 2010, Everett and Rush attended another investor conference. At the conference, Everett stated that he thought the EAGLE 5 "business has been very strong. . . . That business will continue to be a pretty standard and robust business for us." Id. ¶ 103. Plaintiffs allege that the statement was false or misleading because market interest in EAGLE 5 was in decline and "orders for EAGLE XG [were] failing to offset these declines." Id. ¶ 104.

On May 6, 2010, Tekelec filed its 2010 first quarter 10-Q, issued an accompanying press release, and held a conference call. In the press release, Tekelec issued full-year financial guidance that "combined revenues will range between $465 million and $480 million. . . . Finally, we expect our book to bill ratio to be approximately 1 to 1." Id. ¶ 106. As with Tekelec's earlier earnings guidance, plaintiffs argue that these estimates did not reflect Tekelec's true financial state. In the 2010 first quarter 10-Q, Tekelec reported revenue declines, including for EAGLE 5 products. See Id. ¶ 108. Tekelec "primarily" attributed the EAGLE 5 revenue declines "to the timing of the completion of a number of large acceptance based projects in the first quarter of 2009." Id. However, plaintiffs argue that this rationale failed to capture that "EAGLE 5 had been experiencing year-over-year declines on a quarterly, year-to-date, and trailing twelve month basis, as customers in equally important developed markets were focused on next generation products and not purchasing EAGLE 5." Id. ¶ 109.

Finally, during the May 6 conference call with investment analysts, Plastina was asked whether EAGLE 5 was "starting to show its age a little bit before the EAGLE XG pops up." Id. ¶ 112. Plastina responded that "[i]t really is a slow [down] in the emerging markets is what we have seen. The aggressive build up and extension and expansion plans have just been slowed down. We

6

saw a pretty solid US business, including EAGLE 5." Id. Plaintiffs contend that this statement was false or misleading because EAGLE 5 sales were declining not solely due to emerging markets but also in developed markets. Id. ¶ 113.

On August 5, 2010, Tekelec released its Form 10-Q for the second quarter of 2010 ("2010 second quarter 10-Q"), an accompanying press release, and held a conference call with investment analysts. In the press release, Tekelec reported that revenues and orders for the second quarter of 2010 were down 4 and 31 percent, respectively, compared to the second quarter of 2009. See id. ¶ 118. In the press release, Tekelec attributed the drop in orders to a reduction in EAGLE 5 orders "in emerging markets, including ongoing delays caused by security-related regulations imposed by the Indian government." Id. Tekelec also revised downward its earnings forecast for the full year to between $430 million and $450 million. Id. ¶ 119. On the conference call, Plastina told analysts that orders were down compared to the previous year and attributed some of that decline to the Indian security regulations. See id. ¶ 120. Plastina acknowledged that due to delays caused by the security regulations, "we're looking at revenues being pushed out to 2011 for any orders that come from India this year." Id. ¶ 121. The 2010 second quarter 10-Q elaborated on the "weakness in EAGLE 5 related product orders" and EAGLE 5 prospects going forward. Id. ¶ 122. The 10-Q also discussed in greater detail the complications in the Indian market caused by the security regulations, which were slowing order flow. Id. ¶ 122.

Plaintiffs allege that as a result of certain false or misleading statements, Tekelec's stock price became artificially inflated. See id. ¶¶ 14, 139–40. A day after the USA Today article appeared, on August 4, 2010, Tekelec's stock price fell $0.52 per share (3.64 percent). Id. ¶¶ 142–43; see also Stock Price Table [D.E. 42-2]. The following day, Tekelec revealed disappointing financial results for the second quarter of 2010, after which the company's stock price dropped another $1.29 (9.37 percent). SAC ¶¶ 144–46; see also Stock Price Table [D.E. 42-2]. When Tekelec's stock price fell, so too did the value of all investments in Tekelec's stock that

7

Pipefitters, Norfolk, and others had made between February 11, 2010, and August 5, 2010. See SAC ¶ 140.

On May 4, 2012, plaintiffs filed the SAC, which alleges that defendant Tekelec violated Section 10(b) ("section 10(b)") of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j, and the corresponding Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. SAC ¶¶ 169–81. Plaintiffs also allege that defendants Plastina, Everett, and Rush violated section 10(b) and Rule 10b-5. SAC ¶¶ 182–92. Finally, plaintiffs allege that defendants Plastina, Everett, and Rush violated section 20(a) of the 1934 Act ("section 20(a)"), 15 U.S.C. § 78t(a). SAC ¶¶ 193–97.

On May 30, 2012, defendants filed a motion to dismiss the SAC pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6), [D.E. 40], as well as supporting materials [D.E. 41–42]. On July 10, 2012, plaintiffs responded in opposition [D.E. 45–46]. On August 7, 2012, defendants replied [D.E. 52].

II.

On March 26, 2012, the court dismissed plaintiffs' first amended complaint based on improper group pleading. See [D.E. 31] 6. Defendants argue that the SAC contains the same defect. See Defs.' Mem. Supp. Mot. Dismiss [D.E. 41] 4–5.

A complaint against multiple known defendants must specify precisely which defendant is allegedly responsible for which legal violation. See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004); Juntti v. Prudential-Bache Secs., Inc., 933 F.2d 228, 1993 WL 138523, at *2 (4th Cir. 1993) (per curiam) (unpublished table decision); David F. Apple, MD, Prof'l Corp. Pension Plan v. Prudential-Bache Sec., Inc., 820 F. Supp. 984, 987 (W.D.N.C. 1992), aff'd sub nom. Juntti, 1993 WL 138523. A complaint failing to meet this requirement cannot be saved merely by incorporating by reference more specifically pled facts. Juntti, 1993 WL 138523, at *2. Thus, whether in the facts or enumerated claims, a complaint alleging section 10(b) or Rule

8

10b-5 violations against multiple known defendants may not group or aggregate the defendants. If a plaintiff fails to meet the heightened specificity required in private securities fraud actions, courts "shall, on the motion of any defendant, dismiss the complaint." See 15 U.S.C. § 78u-4(b)(1)–(3).

Defendants contend that in the SAC, plaintiffs "made simple line edits . . . by changing 'Individual Defendants' to 'Defendants Plastina, Everett and Rush,' but maintained the same allegations." Defs.' Mem. Supp. Mot. Dismiss 4. In response to the court's March 26, 2012 order, however, plaintiffs adequately identified in the SAC which defendant was responsible for each statement and the basis for that defendant's alleged scienter. Plaintiffs did not automatically substitute "Defendants Plastina, Everett and Rush" where they had previously referred to the defendants in the aggregate. Rather, plaintiffs referred to fewer than all individual defendants by name where appropriate. See, e.g., SAC ¶¶ 86, 91–92. At bottom, defendants' objection is more about the adequacy—rather than the specificity—of the pleadings. Thus, the court rejects defendants' group-pleading objection.

## III.

To survive a Rule 12(b)(6) motion to dismiss a fraud claim, a plaintiff generally must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). When alleging a violation of section 10(b) or Rule 10b-5, the pleading standard for certain elements is even higher. See Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, § 101(b), 109 Stat. 737, 743–49 (codified at 15 U.S.C. § 78u-4); 15 U.S.C. § 78u-4(b); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313–14 (2007); Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181–82 (4th Cir. 2009); Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 170–72 (4th Cir. 2007).

To establish section 10(b) and Rule 10b-5 liability, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

9

misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008); see Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005); Matrix Capital, 576 F.3d at 181.

As for the first element, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." PSLRA § 101(b); see 15 U.S.C. § 78u-4(b)(1); Matrixx Initiatives, 131 S. Ct. at 1318 n.4; Teachers' Ret. Sys., 477 F.3d at 172. Moreover, the allegedly false or misleading statement or omission must be material. See Matrixx Initiatives, 131 S. Ct. at 1318. The Fourth Circuit has clarified that section 10(b) and Rule 10b5 "decidedly do not prohibit any misrepresentation—no matter how willful, objectionable, or flatly false—of immaterial facts, even if it induces reactions from investors that, in hindsight or otherwise, might make the misrepresentation appear material." Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656 (4th Cir. 2004) (emphasis in original).

As for the second element, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. PSLRA § 101(b); see 15 U.S.C. § 78u-4(b)(2)(A); Tellabs, 551 U.S. at 313–14; Teachers' Ret. Sys., 477 F.3d at 172. A "strong" inference is one that is "more than merely plausible or reasonable—it [is] cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see Matrixx Initiatives, 131 S. Ct. at 1324–25. "The strength of an inference cannot be decided in a vacuum." Tellabs, 551 U.S. at 323–24. Thus, at the motion to dismiss stage, the court must consider "plausible, nonculpable explanations for the defendant's conduct." Id. at 324.

In addition to intentional misconduct, the Fourth Circuit has stated that "[p]leading recklessness is sufficient to satisfy the scienter requirement." Matrix Capital, 576 F.3d at 181; see Matrixx Initiatives, 131 S. Ct. at 1323–24 (assuming, without deciding, that recklessness is sufficient to establish scienter for section 10(b) actions). In a securities fraud claim, recklessness

10

means conduct "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Matrix Capital, 576 F.3d at 181 (quotation omitted); see Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 313 (4th Cir. 2009); Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir. 2008). But the scienter threshold is not crossed if the "more compelling" inference is that "defendants acted innocently, or even negligently." Pub. Emps.' Ret. Ass'n, 551 F.3d at 313.

The court "collectively" analyzes the facts allegedly creating a strong inference of scienter; the allegations are not "scrutinized in isolation." Tellabs, 551 U.S. at 323; see Matrix Capital, 576 F.3d at 183 (viewing scienter allegations "holistically"). However, the court "only afford[s] [such] allegations the inferential weight warranted by context and common sense." Matrix Capital, 576 F.3d at 183. The strong inference of scienter must be established against each individual defendant. Id. at 182.

Essentially, plaintiffs theorize that for a period of roughly six months (February to August 2010), Tekelec and its executives hid the effect of Indian security regulations on order bookings, while also masking waning customer demand for EAGLE 5 and the inability of EAGLE XG to make up that lost revenue. The court analyzes the SAC's allegations involving the EAGLE product line and the Indian security issues seriatim.

A.

Plaintiffs allege a number of material misstatements or omissions regarding the EAGLE product line. For simplicity, the court addresses the alleged misstatements by category.

Tekelec provided future-earnings guidance, including annual revenues and book-to-bill ratio, several times during the class period. See SAC ¶¶ 85–86, 106. Plaintiffs allege that this future-earnings guidance was materially false or misleading because it did not reflect the true state of EAGLE products' revenues and was unduly optimistic. See, e.g., id. ¶ 90.

11

Even before the PSLRA, the Fourth Circuit held that future business predictions must constitute "specific guarantees" to be material for the purposes of securities fraud. Raab v. Gen. Physics Corp., 4 F.3d 286, 287 (4th Cir. 1993). In Raab, the court held that a company's annual-report statements that it "expected [an] annual growth rate of 10% to 30% over the next several years" and the company was "poised to carry the growth and success . . . well into the future" were immaterial. Id. at 289. "Soft, puffing statements such as these generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." Id. (internal quotation marks omitted). The Raab court explained that such "[p]redictions of future growth stand on a different footing . . . because they will almost always prove to be wrong in hindsight." Id. at 290. Even revenue predictions made during the same financial year may not be actionable. See id. at 290–91; see also In re Trex Co. Sec. Litig., 454 F. Supp. 2d 560, 576–77 (W.D. Va. 2006). Here, the statements that plaintiffs identify in the SAC fall squarely within the contours of immaterial predictions about future earnings.

Tekelec executives also publicly opined about the present and future success of EAGLE products. For example, the 2009 Form 10-K stated: "We believe that our EAGLE 5 Product Family is successful because of our focus on the development of a competitive, highly scalable system that is able to meet the rigorous technological demands of rapidly growing global service providers and their networks." SAC ¶ 93; see id. ¶ 103 (Everett statement during March 9, 2010 investor conference that the EAGLE 5 "business has been very strong" and the "business will continue to be a pretty standard and robust business for us"). Everett stated at the March 2, 2010 investor conference that Tekelec expected growth to come from EAGLE XG and, with respect to EAGLE 5, that "[i]t's not going to be a lot of growth but it's going to pay a lot of bills, some very good margins coming out of that." Id. ¶ 99. Although plaintiffs cite these statements as false and misleading, the statements are immaterial puffery. See, e.g., Longman v. Food Lion, Inc., 197 F.3d 675, 685 (4th Cir. 1999) (holding a company's statement that it "believe[s] Food Lion's Extra Low Prices and its

12

clean and conveniently located stores are especially well suited to the demands of our customers" was immaterial puffery); Raab, 4 F.3d at 289 (holding a statement that a company's business unit was "poised to carry the growth and success of 1991 well into the future" was immaterial puffery); In re Computer Scis. Corp. Sec. Litig., Case No. 1:11cv610, 2012 WL 3779349, at *12 (E.D. Va. Aug. 29, 2012) (holding that statements during calls with analysts that the company "steadily made progress in delivering on our commitments," executives' "confidence continues to build," and the company was "pleased with [its] progress" were immaterial and non-actionable); In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 892 (W.D.N.C. 2001) (holding that statements that "1998 will continue to be a very active year" and that "we expect further improvements in efficiency" were immaterial).

Plaintiffs also cite several other statements that Tekelec executives made pertaining to its past financial results as false and misleading. Tekelec's 2009 Form 10-K stated that it had "a year over year decline in new orders" but increased demand from North American customers. SAC ¶ 94. Tekelec's 2010 first quarter 10-Q stated that "2010 revenues were negatively impacted by a decrease in EAGLE 5 signaling revenues from our international regions, primarily due to the timing of the completion of a number of large acceptance based projects in the first quarter of 2009." Id. ¶ 108. The 2010 first quarter 10-Q also stated that Tekelec's "product revenues decreased by $3.2 million, or 4% . . . compared with the first quarter of 2009 due to the decrease in revenues from our EAGLE 5 product line." Id. However, simply because a company's earlier disclosures did not include information about events that ultimately came to pass does not mean the earlier disclosures were false or misleading per se. Teachers' Ret. Sys., 477 F.3d at 181. "[A]ccurately reported financial information is not rendered misleading by a failure to disclose conditions that might render future results less favorable." City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp., 865 F. Supp. 2d 811, 823 (W.D. Mich. 2012). Here, plaintiffs claim that these statements were false or misleading because later financial information revealed less favorable results, see SAC ¶ 109, not that the data

13

reported in the 2009 Form 10-K and 2010 first quarter 10-Q was false.

Plaintiffs also allege that Plastina made another false or misleading statement during the May 6, 2010 conference call accompanying the release of Tekelec's 2010 first quarter 10-Q. In response to a question about whether EAGLE 5 was "starting to show its age a little bit before the EAGLE XG pops up," Plastina stated that "[i]t really is a slow [down] in the emerging markets" and Tekelec "saw a pretty solid US business, including EAGLE 5." SAC ¶ 112. Plaintiffs argue this statement was false or misleading because EAGLE 5 sales were declining not solely due to emerging markets but also in developed markets. See id. ¶ 113. However, as reported in the 2010 second quarter 10-Q, the decline of EAGLE 5 orders in "emerging markets and Western Europe was partially offset by continued strength in North America, where orders were up 15% year-over-year during the first half of 2010." [D.E. 42-3] 3. Thus, Tekelec's disclosed financial data shows that Plastina's statement was not false or misleading.

Moreover, many of the allegedly false or misleading statements fall within the PSLRA's safe harbor. The PSLRA provides a safe harbor for certain "forward-looking statements" if the statements are: (1) "identified as forward-looking"; and (2) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). "A statement . . . whose truth or falsity is discernible only after it is made is necessarily forward-looking." Smith v. Circuit City Stores, Inc., 286 F. Supp. 2d 707, 722 (E.D. Va. 2003) (quotation omitted); see, e.g., In re Computer Scis. Corp., 2012 WL 3779349, at *12 (holding a statement that "the company expects to recover its investment" was forward-looking and fell within PSLRA's safe harbor). Basic cautionary language provided at the beginning of a conference call may be sufficient for purposes of the safe harbor if relevant risk factors are discussed. City of Pontiac, 865 F. Supp. 2d at 831–32; see Smith, 286 F. Supp. 2d at 722 (determining that a warning in a 10-Q that "undue reliance should not be placed on any forward-looking statements, which are based on current expectations" was adequately cautionary). Here,

cautionary information about relevant risks accompanied Tekelec's statements. See [D.E. 42-3] 3; [D.E. 42-9] 4; [D.E. 42-10] 2; [D.E. 42-11] 4–8; [D.E. 42-13] 3; [D.E. 42-14] 8–9; [D.E. 42-16] 2.

Finally, plaintiffs identify two statements that two different investment firms (Jeffries & Co. and Avondale Partners) made in February 2010 as allegedly false or misleading and seek to attribute liability to Tekelec. See SAC ¶ 88. Assuming without deciding that Tekelec could be responsible for the analysts' statements, plaintiffs must allege that Tekelec had some kind of control over the content of the independent, third-party statement. See Raab, 4 F.3d at 288–89; cf. In re aaiPharma Inc. Sec. Litig., 521 F. Supp. 2d 507, 510 (E.D.N.C. 2007) ("The Fourth Circuit has intimated that there can be no liability under section 10(b) where a party itself does not make a representation to the market."). Moreover, "a corporate insider may be liable for misleading statements in analyst reports only if the plaintiff alleges that the defendant intentionally fostered a mistaken belief concerning a material fact that was incorporated into reports or that the defendant adopted or placed his imprimatur on the report." City of Pontiac, 865 F. Supp. 2d at 827.

The February 12, 2010 statement by Jeffries & Co. cannot create liability for defendants because the analysts were offering their independent opinion about the relative value of Tekelec's business metrics. Likewise, the February 11, 2010 statement by Avondale Partners cannot create liability for defendants because it merely duplicates the immaterial earnings guidance.

### B.

Alternatively, even assuming that plaintiffs adequately alleged false or misleading statements about the EAGLE products, plaintiffs' allegations do not create the requisite strong inference of scienter against Plastina, Everett, Rush, or Tekelec.

### 1.

As for Plastina, plaintiffs allege nine bases for a strong inference of scienter. The court outlines the allegations, describes the competing non-culpable inference, and then engages in the holistic scienter analysis.

15

First, plaintiffs cite reports from Tekelec personnel (not named as individual defendants) who attended Tekelec's revenue meetings and who then reported back to Plastina. See SAC ¶¶ 76–79. Former senior project manager CW5[3] attended the revenue meetings and said that David Rice, Tekelec's senior vice president for operations, reported back to Plastina about the meetings. Id. ¶ 76. CW6 and CW8 also said that the meetings took place. Id. ¶¶ 77–78.

Second, according to CW6, Plastina received via e-mail a so-called scorecard for each order detailing the order's revenue and probability of receiving payment. See id. ¶ 80. The database-generated scorecard "compiled all of the 'booked' orders and potential revenue." Id. These scorecards, which were discussed at the revenue meetings, included a projection of the probability of being paid by the end of the quarter. Id.

Third, according to CW6, Plastina and other high-level executives comprised the revenue projection team. Id. ¶ 81. Fourth, Plastina was focused on how each product and order was performing through the order scorecards and revenue meetings. See id. ¶ 82. Fifth, Tekelec entered into high-risk deals, which required CFO approval, and lowered its credit standards to prolong the life of EAGLE 5. See id. ¶ 75. According to CW4, a former senior manager in the customer service department, id. ¶ 42, Tekelec lowered its credit standards for EAGLE 5 orders "prior to and likely during the class period." Id. ¶ 75 (emphasis added).

Sixth, Plastina allegedly knew that revenue from EAGLE 5 was decreasing faster than EAGLE XG generated new revenue. See id. ¶¶ 68–74, 90, 128. CW1, a technical trainer for EAGLE 5, claimed that "EAGLE 5 had reached its saturation point by the end of 2009." Id. ¶ 68. CW2 alleged generally that EAGLE 5 was "losing business." Id. ¶ 69. CW3, who left Tekelec in March 2010, said that EAGLE 5 was a "mature product." Id. CW4 saw charts in 2010 indicating that sales of EAGLE 5 were declining. Id. ¶ 70. CW4, who worked on a different product line, also

---

[3] Plaintiffs rely on many confidential witnesses ("CW") whom they identify by number, e.g., CW1, CW2, etc.

16

said that EAGLE XG's sales were not meeting expectations. Id. CW3 also generally knew that EAGLE XG was not selling well. Id. CW5, a senior project manager until 2011, said that the transition from EAGLE 5 to EAGLE XG was "difficult" and that EAGLE XG's sales were not meeting expectations. Id. ¶ 71. CW6 and CW7 offered generalized comments about sales not being good for EAGLE XG. Id. ¶ 72. CW7 said that he discussed the lack of sales of EAGLE XG with a vice president of GPS Business Operations. Id. ¶ 73. Finally, CW11, a global sales representative, said that EAGLE 5 was not being developed further. Id. ¶ 74.

Seventh, Tekelec's 2010 second quarter 10-Q contained admissions about EAGLE 5's sales declines on a year-to-year, quarterly, and trailing twelve-month basis, as well as EAGLE XG's slow sales growth. Id. ¶¶ 90, 129. Eighth, because EAGLE 5 was a core operation at Tekelec, Plastina, as CEO, would have known all the details about this major revenue source. Id. ¶¶ 60–67, 130. Ninth, plaintiffs allege that Plastina's insider-trading patterns during the class period support an inference of scienter. Id. ¶¶ 131–32.

Defendants respond that plaintiffs' allegations concerning Plastina do not rise to the level of fraudulent intent. Although defendants' arguments focus on the individual bases for scienter, the overarching, non-culpable theme is that Tekelec and its executives were operating in a dynamic business environment at a time when Tekelec was in transition from the older EAGLE 5 to the next generation EAGLE XG. Unfortunately, as 2010 developed, sales of both products did not allow Tekelec to attain its initial earnings goals.

The court holistically compares plaintiffs' allegations to the non-culpable narrative to see whether plaintiffs' allegations create a strong inference of scienter that is at least as compelling as competing, non-culpable inferences. First, three confidential witnesses (CW5, CW6, CW8) stated that Plastina received reports from at least one subordinate who attended the revenue meetings.[4]

_____

[4] "When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the

17

However, none of the confidential witnesses who attended the meetings alleges anything about what occurred at these meetings. Plaintiffs do not allege that financial data or forecasts discussed at these meetings did not match what Tekelec was reporting publicly. Mere allegations of regular management meetings provide "weak support at best" for an inference of scienter. See In re Computer Scis. Corp., 2012 WL 3779349, at *8. Thus, a non-culpable inference is more compelling.

Second, CW6, who attended the revenue meetings and received the scorecards, alleged that Plastina received by e-mail a copy of the order scorecards, which noted revenue amounts and estimates of the timeliness of payment. These scorecards were discussed at the revenue meetings. However, plaintiffs fail to allege anything further regarding the details on the order scorecards. For instance, plaintiffs do not allege that the scorecards reflected declining revenues or low probabilities of receiving payment inconsistent with any public statement that Plastina or Tekelec made. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 196 (2d Cir. 2008). Thus, a non-culpable inference is more compelling.

Third, CW6 alleged that Plastina served on the revenue-projection team. However, CW6 did not serve on the revenue-projection team and, accordingly, makes no allegations about what members of the revenue-projection team discussed. Absent CW6's personal knowledge, the court declines to credit this inference in support of scienter. See City of Pontiac, 865 F. Supp. 2d at 834 n.9 (determining that confidential witness statements were unable to establish scienter because "none of the CWs had contact with Defendants" and thus they "cannot testify as to what Defendants knew").

_____

position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations." Teachers' Ret. Sys., 477 F.3d at 174 (quotations omitted); see In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig., 876 F. Supp. 2d 616, 640 (D. Md. 2012). Defendants contend that plaintiffs generally failed to establish the job responsibilities and sources of information for the confidential witnesses. See Defs.' Mem. Supp. Mot. Dismiss 11–13. Thus, the court addresses the confidential witnesses with each proffered basis for scienter.

Case 5:11-cv-00004-D   Document 53   Filed 03/22/13   Page 18 of 32

Fourth, plaintiffs generally allege that Plastina was focused on how each order and product was performing through the scorecard and reports from revenue meetings. As discussed, non-culpable inferences about the scorecard and revenue meetings are more compelling.

Fifth, CW4, a former senior manager in the customer service department, stated that "prior to and likely during the class period," SAC ¶ 75 (emphasis added), Tekelec lowered its credit standards to prolong sales of EAGLE 5. Plaintiffs do not offer any basis for CW4, as a customer service manager, to know about lowered credit standards—let alone a basis for his allegation that Plastina had "intimate" knowledge of such deals. See City of Pontiac, 865 F. Supp. 2d at 834 n.9. Moreover, CW4 does not have actual knowledge that this practice occurred during the class period. Despite plaintiffs' conclusory label that these were high-risk deals, plaintiffs offer no further explanation as to why these were not legitimate transactions. Thus, a non-culpable inference is more compelling.

Sixth, a host of confidential witnesses (CW1, CW2, CW3, CW4, CW5, CW6, CW7, and CW11) allege that Plastina knew that EAGLE 5 revenue was declining faster than it could be made up by revenue from EAGLE XG. None of the confidential witnesses, however, alleges direct interaction with Plastina or awareness of Plastina's knowledge. See, e.g., City of Pontiac, 865 F. Supp. 2d at 834 n.9. CW7 said he discussed the lack of EAGLE XG sales with a Tekelec vice president, but CW7 makes no allegation about the substance of the conversation or what action the vice president took—let alone anything tying Plastina to the conversation. Several confidential witnesses allegedly had personal knowledge that demand for EAGLE 5 was declining.[5] CW1, a technical trainer for EAGLE 5, described how in February 2010 only five of twelve trainers were assigned to EAGLE 5 and by July 2010 those five EAGLE 5 trainers had been laid off. SAC ¶ 68.

_____

[5] To the extent that plaintiffs cite allegations about EAGLE 5 by CW2, CW3, CW5, CW6, these allegations are based on generalized office scuttlebutt rather than personal knowledge. Thus, they carry little weight. See In re Mun. Mortg., 876 F. Supp. 2d at 640 ("Hearsay allegations and bald assertions made by confidential witnesses will not defeat a Rule 12(b)(6) motion.").

CW4 saw charts in 2010 indicating that EAGLE 5 sales were in decline. Id. ¶ 70. CW11, a global sales representative, said that EAGLE 5 was not being developed further. Id. ¶ 74. But these allegations are entirely consistent with the non-culpable explanation that EAGLE 5 was an older generation product with declining sales and institutional support at a time when Tekelec sought to transition to the newer generation EAGLE XG. Indeed, that explanation is more compelling and comports with Tekelec's public disclosures about the transition from EAGLE 5 to EAGLE XG.

Seventh, plaintiffs emphasize the "admissions" contained in Tekelec's 2010 second quarter 10-Q, acknowledging both that sales of EAGLE 5 were declining on a year-to-year, quarterly, and trailing-twelve-month basis and that sales of EAGLE XG were not performing as hoped. See, e.g., SAC ¶¶ 90, 129.[6] In the second quarter 10-Q, Tekelec stated that "growth in [next generation] products did not offset the decline in our EAGLE 5 related products, as orders for this product line continued to experience year-over-year declines on a quarterly, year-to-date, and trailing twelve months basis." [D.E. 42-3] 3. Tekelec noted that "[t]he decline in EAGLE 5 related product orders was particularly pronounced in the emerging markets and Western Europe" but it "was partially offset by continued strength in North America, where orders were up 15% year-over-year during the first half of 2010." Id.

Although disclosure "is certainly not dispositive" as to a lack of scienter, it can substantiate a non-culpable inference that "corporate agents lacked sufficient information" to report until the eventual disclosure date. Matrix Capital, 576 F.3d at 192. Moreover, courts have rejected the "circular logic" that because a company later disclosed adverse news, executives must have known

---

[6] Plaintiffs do not allege that the financial data contained in Tekelec's SEC filings are inaccurate. Even if Tekelec had issued a restatement of earnings, "it is well settled that the mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." City of Brockton Ret. Sys. v. Shaw Grp. Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008). Again, that plaintiffs do not even cite to a restatement or inaccuracy in financial data militates against the allegations of scienter. See In re Constellation Energy Grp., Inc. Sec. Litig., 738 F. Supp. 2d 614, 636 (D. Md. 2010) ("This is not a case where the defendants deliberately shut their eyes to information indicating the inaccuracy of their public statements.").

about the adverse news before it was disclosed yet kept it quiet. See, e.g., In re Constellation Energy, 738 F. Supp. 2d at 636. Merely because later projections are less optimistic than an initial projection does not mean that the initial projection was fraudulent. "Pleading fraud by hindsight, or Monday morning quarterbacking of this sort, is insufficient pleading under the [PSLRA]." Smith, 286 F. Supp. 2d at 715 (quotation omitted). Thus, the information disclosed in the 2010 second quarter 10-Q weakens significantly plaintiffs' allegations of a strong inference of scienter.

The use of the 2010 second quarter 10-Q to support a strong inference of scienter is diminished further when the 10-Q is considered in conjunction with Tekelec's financial reports. "[T]he company's full disclosure of the negative [financial results] during the time leading up to and throughout the Class Period further militates against an inference of scienter on the part of the individual Defendants." In re Acterna Corp. Sec. Litig., 378 F. Supp. 2d 561, 577 (D. Md. 2005) (noting that company's disclosures of negative results pertained directly to the trouble source alleged by plaintiffs). Repeated public disclosures during the proposed class period that related to the business operations at issue "tend[] to negate an inference that [the company] was intentionally or recklessly misleading investors." In re Mun. Mortg., 876 F. Supp. 2d at 643–44. For example, Tekelec reported in its 2009 third quarter Form 10-Q, that EAGLE 5 revenues had declined in part because of "lower orders in 2009." [D.E. 42-12] 3. In the 2009 Form 10-K, which Tekelec filed on February 25, 2010, Tekelec reported that revenue from its EAGLE product lines had decreased from the previous year. See [D.E. 42-8] 4. In the 2010 first quarter 10-Q, Tekelec stated that while it expected growth (to an unspecified degree) from EAGLE XG, it expected "flat to down orders and revenues for [its] EAGLE 5 product line." [D.E. 42-14] 6 (emphasis added). Indeed, a chart comparing EAGLE product line revenue for the first quarter of 2009 and 2010 indicated a 5% revenue decrease in 2010. See id. Thus, Tekelec's public disclosures before the 2010 second quarter 10-Q, in addition to the disclosures contained in the 2010 second quarter 10-Q, provide more compelling support for a non-culpable inference than an inference of scienter.

21

Eighth, plaintiffs offer a generalized allegation that because the EAGLE product line was a major revenue source for Tekelec, Plastina should be imputed with knowledge of all EAGLE products and orders. However, the fact that the alleged misstatements and omissions related to core operations does not necessarily establish scienter. See In re Mun. Mortg., 876 F. Supp. 2d at 643; In re Constellation Energy, 738 F. Supp. 2d at 635–36. Here, the core-operations allegations provide more compelling support for a non-culpable inference than an inference of scienter.

Ninth, plaintiffs identify Plastina's insider trading during the proposed class period as raising an inference of scienter. During the proposed class period, in four separate transactions, Plastina sold 196,775 shares and netted over $3.1 million in proceeds. SAC ¶ 132. Plastina's sales occurred on February 17, 2010, February 22, 2010, May 11, 2010, and May 14, 2010. Id. In the six months before the class period, Plastina sold 113,703 shares over three separate transactions and netted over $1.7 million. Id.

The Supreme Court has stated that "motive can be a relevant consideration" for the inference of scienter and that "personal financial gain may weigh heavily in favor of a scienter inference." Tellabs, 551 U.S. at 325. To be relevant to scienter, the "timing and amount of a defendant's trading [must be] unusual or suspicious." Teachers' Ret. Sys., 477 F.3d at 184 (quotation omitted). Merely because executives sold shares during the proposed class period and netted substantial sums does not necessarily imply scienter. In re Mun. Mortg., 876 F. Supp. 2d at 641–42 (allegations that six insiders sold $12 million in shares during class period did not create themselves "unusual or suspicious" inferences). Rather, the court should "consider the [defendant's] total number of shares and vested stock options as stated in SEC filings." Cozzarelli, 549 F.3d at 628. Stock sales during the proposed class period that are "modest to de minimis" do not support an inference of scienter." Cozzarelli, 549 F.3d at 628 (citing examples of executives selling 13%, 12%, and 3% of their holdings).

As for the timing, Plastina's first sale during the class period occurred on February 17, 2010,

22

six days after Tekelec issued its revised-earning guidance in a press release and conference call. See SAC ¶ 132; [D.E. 42-1] 8–9 (Plastina Form 4 for February 17 sale). The second sale occurred on February 22, 2010, eleven days after the revised-earnings guidance was issued and three days before Tekelec filed its Form 10-K for 2009. See [D.E. 42-1] 10 (Plastina Form 4 for February 22 sale). The third sale occurred on May 7 and May 11, 2010, shortly after Tekelec filed its 2010 first quarter 10-Q and accompanying press release on May 6. See [D.E. 42-1] 12–13 (Plastina Form 4 for May 7 and May 11 sales). The fourth sale occurred a few days later on May 14, 2010. See [D.E. 42-1] 14–15 (Plastina Form 4 for May 14 sale). Several of the sales occurred soon after the release of positive press statements and therefore might provide some support for an inference of scienter.

As for the amount of the sales, Plastina's total share holdings actually increased during the class period. Before his first sale on February 17, 2010, Plastina held 165,730 shares. [D.E. 42-1] 8. After his final sale on May 14, 2010, Plastina held 180,881 shares. [D.E. 42-1] 14. Thus, Plastina's trading in amounts that left him with more shares at the end of the class period than at the start is not unusual or suspicious. See, e.g., Cozzarelli, 549 F.3d at 627–28; In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 247 (8th Cir. 2008). Thus, on balance, the insider trading allegations fail to support an inference of scienter as compelling as a non-culpable explanation.[7]

To the extent that plaintiffs also rely on the positive statements that Plastina made at conferences and during calls, the court should be cautious of "infer[ing] scienter from every bullish statement" by a company's executives for fear of "fueling frivolous litigation." Cozzarelli, 549 F.3d

_____

[7] Defendants also note that Plastina's trading (as well as trades by Everett and Rush) occurred pursuant to a non-discretionary Rule 10b5-1 trading plan filed with the SEC. See Defs.' Mem. Supp. Mot. Dismiss 6–7. Courts are divided about whether to consider Rule 10b5-1 plans at the motion to dismiss stage. See In re Mun. Mortg., 876 F. Supp. 2d at 641 n.34 (noting the split in approaches and deciding the issue on other grounds); In re Constellation Energy, 738 F. Supp. 2d at 637 (citing the fact that stock sales were made pursuant to an established Rule 10b5-1 trading plan as a reason not to infer scienter). Here, the court need not weigh in on the dispute. Even if the court ignores the Rule 10b5-1 trading plan, the outcome is the same: plaintiff's allegations do not support a strong inference of scienter.

at 627. It is possible for company executives to make "imprecise or even negligent use of language" without creating an inference of scienter. Id. Moreover, as discussed, many of Plastina's statements are not actionable as false or misleading.

After "assess[ing] all the allegations holistically," the court concludes that plaintiffs have failed to raise an inference of scienter as to Plastina that is "at least as strong as any opposing inference." See Tellabs, 551 U.S. at 326. Plaintiffs' showing of scienter largely consists of generalized claims that do not reach into Tekelec's executive boardroom and are not inconsistent with Tekelec's public financial statements. Furthermore, "plaintiffs have not alleged the existence of any internal documents from [Tekelec] or other direct statements contradicting the inference that defendants acted with a lawful intent." Cozzarelli, 549 F.3d at 626. Thus, as to Plastina, plaintiffs have failed to raise a strong inference of scienter.

2.

As for Everett, plaintiffs' allegations of scienter are curtailed by Everett's retirement from Tekelec in March 2010. In any event, plaintiffs cite many of the same bases for scienter against Everett as they did against Plastina. Plaintiffs allege that Everett's representative attended the revenue meetings, SAC ¶ 76; Everett received the order scorecard by e-mail, id. ¶ 80; Everett was a member of the revenue team, id. ¶ 81; Everett was the CFO for high risk EAGLE deals, id. ¶ 75; and, as CFO, Everett would have been aware of every detail of EAGLE as a core operation of Tekelec. Id. ¶ 130. However, those allegations raise no more compelling of an inference against Everett than they did against Plastina.

The only distinct allegations against Everett are that, according to CW6, "Everett frequently 'popped his head' into the weekly revenue meetings," id. ¶ 77, and Everett's insider stock sales. The allegation that Everett sometimes "popped his head" into the revenue meetings without more does not aid plaintiffs' quest to establish scienter. That leaves Everett's insider trading. He had no sales in the six months before the class period, but had one sale on February 18, 2010, of 24,000 shares

24

netting $398,808.00. See SAC ¶ 134; [D.E. 42-1] 6–7 (Form 4). After the sale, Everett retained ownership of 13,191 shares of Tekelec stock. [D.E. 42-1] 6. Given the range of non-culpable inferences for this single transaction—including that Everett was retiring from Tekelec the next month—the evidence provides no meaningful support for scienter. See Cozzarelli, 549 F.3d at 628 (noting that executives' "departures, rather than an intent to defraud" better explained their stock sales (quotation omitted)). Thus, as to Everett, plaintiffs' allegations do not create a strong inference of scienter.

3.

As for Rush, who took over as CFO after Everett retired, the allegations of scienter are largely the same as those against Everett. Plaintiffs allege that Rush's representative attended regular revenue meetings, SAC ¶ 76; Rush received the order scorecard by e-mail, id. ¶ 80; Rush was a member of the revenue team, id. ¶ 81; Rush signed the 2010 first quarter 10-Q, id. ¶ 109; and, as CFO, Rush would have been aware of every detail of EAGLE as a core operation of Tekelec. Id. ¶ 130. Plaintiffs' allegations about Tekelec engaging in high-risk financing deals post-March 2010 are based only on CW4's "likely" opinion and thus are weak. Id. ¶ 75. These allegations collectively raise no more compelling of an inference of scienter against Rush than they did against Plastina or Everett.

The only unique allegations against Rush involve his insider trading. During the class period, Rush sold stock on March 8, 2010, and May 19, 2010, totaling 11,174 shares. See SAC ¶ 133; [D.E. 42-1] 2–5 (Rush Form 4s). On both occasions, Rush's sales brought his balance of shares to zero. See [D.E. 42-1] 2–5. Plaintiffs attempt to link Rush's May 19, 2010 transaction to the release of Tekelec's 2010 second quarter 10-Q on August 5, 2010. See SAC ¶ 133. The attempt to link these events, which took place about three months apart, is tenuous at best. Even if Rush's insider trading might provide support for an inference of scienter (a dubious notion), plaintiffs fail to create an inference of scienter at least as compelling as a non-culpable inference.

25

4.

For a securities fraud allegation against a corporate defendant to survive a motion to dismiss, it must be based upon adequate allegations of scienter against "at least one authorized agent of the corporation." Matrix Capital, 576 F.3d at 182; Teachers' Ret. Sys., 477 F.3d at 184. In their response, plaintiffs belatedly assert that they established Tekelec's corporate scienter based on the knowledge of other non-defendant executives. See Pls.' Mem. Opp'n Mot. Dismiss [D.E. 45] 21 & n.14. Plaintiffs' allegations pertaining to these other executives do not create a strong inference of corporate scienter that is at least as compelling as a non-culpable inference. Because plaintiffs failed to adequately allege scienter against Plastina, Everett, or Rush with respect to the EAGLE products statements, there is no basis for Tekelec's liability.

C.

Plaintiffs allege several false or misleading statements with respect to Tekelec's Indian security clearance issues. As with the EAGLE products, many of the statements that plaintiffs identified are immaterial. For example, during the February 11, 2010 conference call with analysts, Plastina stated that Tekelec's "number portability success in India continues," SAC ¶ 86, that Tekelec was "especially pleased with our growth in the emerging markets such as India," id., and that Tekelec's "position in India . . . remains strong." Id. ¶ 87. During the March 9, 2010 investor conference, Everett stated that India "is a very good business for us, and we see that as a growth driver for our business going forward." Id. ¶ 101. These statements are immaterial puffery. See, e.g., Longman, 197 F.3d at 685; Raab, 4 F.3d at 289; In re Computer Scis. Corp., 2012 WL 3779349, at *12; In re First Union, 128 F. Supp. 2d at 892. Moreover, considering the context in which Plastina made the February 2010 statements, no rational person could even consider them false. Plastina's comment about success in India was based on the fact that, as he stated in the next sentence, Tekelec won eight of ten contract bids in India in 2009. See SAC ¶ 86. Plaintiffs do not contend that Tekelec did not win these bids.

26

With respect to India, plaintiffs contend that Tekelec and its executives repeatedly failed to disclose that no security clearances had been granted thereby causing delays for Tekelec's revenue recognition. See, e.g., SAC ¶¶ 92, 98, 102. However, section "10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, 131 S. Ct. at 1321. Rather, disclosure is required "only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" Id. (quoting 17 C.F.R. § 240.10-5(b)); see id. (acknowledging the ability of "companies [to] control what they have to disclose . . . by controlling what they say to the market"). Here, nothing suggests that, based on successful contract bids, Plastina and Everett needed to explain the security clearance issues to make their statements about Tekelec's growth prospects in India not misleading. Thus, Plastina and Everett were not under a duty to disclose.

Moreover, Tekelec discussed the security clearance issue on May 6, 2010, in statements accompanying the release of the 2010 first quarter 10-Q. A press release that Plastina signed indicated that first quarter orders "were adversely impacted in part by new [security] regulations in India," that the regulations had "resulted in the delay of approximately $10 million of orders," and that Tekelec "expect[ed] to receive these orders during the second quarter of 2010." SAC ¶ 105. During a conference call that day, Plastina reiterated those statements, see id. ¶ 111, and later added that "India, then has the security issues that really delayed things by about 90 days in the first quarter." Id. ¶ 112. Plaintiffs allege that these statements were false or misleading because Plastina knew that the Indian security issues would not be cleared up by the second quarter of 2010 (as Tekelec acknowledged in the 2010 second quarter 10-Q). See id. ¶¶ 105, 114. However, simply because a company's earlier disclosures did not include information about events that ultimately came to pass does not mean the earlier disclosures were false or misleading per se. See Teachers' Ret. Sys., 477 F.3d at 181. Moreover, as discussed below, plaintiffs failed to allege sufficient facts to show Tekelec or its executives did not believe that the Indian security clearance issues could not

27

be resolved by the second quarter. <u>See</u> <u>Hillson Partners Ltd. P'ship v. Adage, Inc.</u>, 42 F.3d 204, 213 (4th Cir. 1994).

D.

Even if plaintiffs adequately alleged false or misleading statements about Tekelec's Indian operations, plaintiffs' allegations fail to create a strong inference of scienter. Plaintiffs allege six bases for creating a strong inference of scienter as to Plastina. First, Tekelec had been doing business in India since February 2004 and "would have been well-aware that lengthy regulatory delays in India are commonplace." SAC ¶ 36. Second, according to CW4, CW8, and CW10, the Indian market was important to Tekelec and management was focused on India. <u>Id.</u> ¶¶ 42–43. Third, according to CW6, who spoke with others in India, those other individuals told CW6 that it "always takes longer than you think" in India. <u>Id.</u> ¶ 59. Fourth, Professor Vikramaditya Khanna offers an expert opinion that the Indian security regulations would have resulted in delays of at least six months and it was not reasonable for Plastina to have relied on the timeline set forth in the documents from the Indian Ministry of Telecommunications. <u>Id.</u> ¶¶ 45–46. Fifth, Plastina should have known that delays would ensue when the Indian government continued to issue revised security directives in January, February and March 2010. <u>Id.</u> ¶¶ 37–39. Finally, plaintiffs again cite Plastina's insider trading. <u>Id.</u> ¶ 132.

The competing non-culpable inference to these six allegations is that the new security regulations posed a dynamic situation for Tekelec and that Tekelec was simply reacting to the repeated modifications of the security regulations by the Indian government. Moreover, plaintiffs make no allegations that Plastina, or any other Tekelec executive, possessed yet withheld any information beyond that which Tekelec disclosed. <u>See</u> Defs.' Mem. Supp. Mot. Dismiss 20–27.

The court now engages in the holistic scienter analysis. First, plaintiffs offer the generalized allegation that, based on years of Tekelec operating in India, Plastina would have known regulatory delays are common in India. In support, plaintiffs recount the saga of the Indian government's 3G

28

auction. See SAC ¶¶ 50–55. However, Tekelec did not participate in that auction; therefore, its probative value is extremely limited. Moreover, generalized allegations about regulatory delays are not the particular facts required to help create a strong inference of scienter. Thus, these allegations have a negligible impact and do not support a strong inference of scienter.

Second, plaintiffs offer confidential witness statements about how Tekelec management, including personnel who reported to Plastina, were focused on the Indian market. "It is not sufficient to allege that corporate management was generally aware of the day-to-day operations without adding some additional allegation of specific information conveyed to management and related to the fraud." In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig., 694 F. Supp. 2d 1192, 1208 (W.D. Wash. 2009) (quotation omitted). Here, the confidential witnesses allege nothing more specific than that management saw India as a source of revenue and focused attention on the market. See SAC ¶¶ 42–43. Furthermore, the confidential witnesses do not allege that Tekelec management possessed details about the security clearance delays beyond information publicly disclosed by the Indian government and Tekelec. The obvious competing inference is that, as Tekelec described in many public statements, Tekelec saw India as a potential growth market. Indeed, in 2009, Tekelec successfully bid on eight of ten contracts in India. Thus, the non-culpable inference that management was focused on India for legitimate business reasons is more compelling than the inference that management knew the Indian government would revise the security directives and orders would be delayed.

Third, plaintiffs offer the hearsay statement of CW6 that things take longer in India. This hearsay provides no support for an inference of scienter. See, e.g., In re Mun. Mortg., 876 F. Supp. 2d at 640.

Fourth, plaintiffs' expert Khanna opines about what would have been reasonable for Plastina to believe. Defendants object to consideration of the expert's allegations at this stage of the case. See Defs.' Mem. Supp. Mot. Dismiss 21–22.

29

In analyzing a motion to dismiss, some courts have considered expert opinions to support scienter when those experts offer particularized allegations from a base of knowledge. See, e.g., Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 257–58 (5th Cir. 2005) (considering expert opinion about whether company complied with specific accounting regulations); Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1233 (9th Cir. 2004) (considering opinion of expert on accounting issue where expert had reviewed internal records and spoken with company employees). However, courts are less receptive to expert opinions not based in fact or that do not offer a particularized allegation. See, e.g., Roth v. OfficeMax, Inc., 527 F. Supp. 2d 791, 801 (N.D. Ill. 2007).

Plaintiffs' expert Khanna surveyed "publicly available news articles, reports, Indian case law and materials from the Telecommunications Ministry, and relied on his expertise in the Indian regulatory field" to opine about what Plastina should have known. SAC ¶¶ 45–46. Plaintiffs' expert Khanna does offer a particularized opinion about what would have been reasonable for Plastina to believe. The court assumes without deciding that it may consider Khanna's opinion as support for scienter. Nonetheless, given the generality of the opinion, it offers little support for an inference of scienter.

Fifth, plaintiffs cite the Indian government's repeated modifications of the security clearance from January to March 2010 as evidence that Plastina knew the regulations would negatively impact Tekelec's revenues beyond the second quarter of 2010. On May 6, 2010, Plastina twice stated that the regulations were delaying orders, but that Tekelec expected to receive the orders during the second quarter of 2010. The non-culpable competing inference is simply that Plastina was making his best projection based on the evidence that he had at the time. Plaintiffs make no specific allegation about other contrary information that Plastina possessed or would have possessed at the time. See, e.g., Cozzarelli, 549 F.3d at 626. The competing non-culpable inference is supported by the May 6 public disclosures and the updates about the prolonged effect of the delays in the 2010

30

second quarter 10-Q. Such repeated disclosures militate against an inference of scienter. See, e.g., Matrix Capital, 576 F.3d at 192; In re Mun. Mortg., 876 F. Supp. 2d at 644.

Finally, plaintiffs again resort to Plastina's insider trading. The timing of Plastina's sales relative to the Indian regulatory delays does not suggest any fraudulent motive. Simply put, the trades reflect no strong inference of scienter.

A holistic analysis of plaintiffs' allegations reveals, at most, that Plastina negligently failed to appreciate the delays that would result from India's security regulations. Plaintiffs make no allegations about conversations, legal opinions, or other internal documents known to Plastina to suggest he had information beyond that provided by the Indian government. Thus, plaintiffs have failed to create a strong inference of scienter as to Plastina.

Plaintiffs also make no additional, unique allegations to support an inference of scienter against Everett or Rush aside from those made against Plastina, as well as insider trades by Everett and Rush. As discussed, the insider-trading allegations alone do not create a strong inference of scienter against Everett or Rush.

As with the EAGLE products allegations, plaintiffs failed to create a strong inference of scienter against any authorized agent of Tekelec relative to the Indian security clearance issue. Accordingly, there is no basis for Tekelec's corporate liability. See Matrix Capital, 576 F.3d at 182; Teachers' Ret. Sys., 477 F.3d at 184.

IV.

"Because the complaint fails to withstand a Rule 12(b)(6) motion with respect to the predicate violation of [section] 10(b), it also fails with respect to the [section] 20(a) claims." Matrix Capital, 576 F.3d at 192; see In re Acterna, 378 F. Supp. 2d at 589. Thus, plaintiffs' claim under section 20(a) is dismissed.

31

Case 5:11-cv-00004-D Document 53 Filed 03/22/13 Page 31 of 32

V.

Upon holistic evaluation, plaintiffs' allegations in the second amended complaint fall within the heartland of securities fraud actions that the PSLRA intended to curtail. The allegedly false or misleading statements that plaintiffs cite are not actionable. Plaintiffs have failed to create the required strong inference of scienter against any individual defendant or, by extension, Tekelec. A reasonable person would find more compelling the cogent, non-culpable explanations for defendants' conduct. Thus, the court GRANTS the motion to dismiss [D.E. 40]. Having considered plaintiffs' last-ditch request to file a third amended complaint, see Pls.' Mem. Opp'n Mot. Dismiss 40 n.26, the request is DENIED. The request is futile and permitting yet another amended complaint would prejudice defendants.

SO ORDERED. This **22** day of March 2013.

JAMES C. DEVER III
Chief United States District Judge

Case 5:11-cv-00004-D   Document 53   Filed 03/22/13   Page 32 of 32